CARROLL ET AL. *v.* PRESIDENT AND COMMISSIONERS OF PRINCESS ANNE ET AL.

No. 6. Argued October 21, 1968.—Decided November 19, 1968.

*Eleanor Holmes Norton* and *William H. Zinman* argued the cause for petitioners. With them on the brief were *Melvin L. Wulf* and *Leon Friedman*.

*S. Leonard Rottman* and *Alexander G. Jones* argued the cause for respondents. With them on the brief was *Francis B. Burch,* Attorney General of Maryland.

MR. JUSTICE FORTAS delivered the opinion of the Court.

Petitioners are identified with a "white supremacist" organization called the National States Rights Party. They held a public assembly or rally near the courthouse steps in the town of Princess Anne, the county seat of Somerset County, Maryland, in the evening of August 6, 1966. The authorities did not attempt to interfere with the rally. Because of the tense atmosphere which developed as the meeting progressed, about 60 state policemen were brought in, including some from a nearby county. They were held in readiness, but for tactical reasons only a few were in evidence at the scene of the rally.

Petitioners' speeches, amplified by a public address system so that they could be heard for several blocks, were aggressively and militantly racist. Their target was primarily Negroes and, secondarily, Jews. It is sufficient to observe with the court below, that the speakers engaged in deliberately derogatory, insulting, and threatening language, scarcely disguised by protestations of peaceful purposes; and that listeners might well have construed their words as both a provocation to the Negroes in the crowd and an incitement to the whites. The rally continued for something more than an hour, concluding at about 8:25 p. m. The crowd listening to the speeches increased from about 50 at the beginning to about 150, of whom 25% were Negroes.

In the course of the proceedings it was announced that the rally would be resumed the following night, August 7.[1]

---

[1] Petitioner Norton said, "I want you to . . . be back here at the same place tomorrow night, bring every friend you have . . . . We're going to take it easy tonight . . . " and "You white folks

On that day, the respondents, officials of Princess Anne and of Somerset County, applied for and obtained a restraining order from the Circuit Court for Somerset County. The proceedings were *ex parte,* no notice being given to petitioners and, so far as appears, no effort being made informally to communicate with them, although this is expressly contemplated under Maryland procedure.[2] The order restrained petitioners for 10 days from holding rallies or meetings in the county "which will tend to disturb and endanger the citizens of the County."[3] As a result, the rally scheduled for August 7 was not held. After the trial which took place 10 days later, an injunction was issued by the Circuit Court on August 30, in effect extending the restraint for 10 additional months. The court had before it, in addition to the testimony of witnesses, tape recordings made by the police of the August 6 rally.

On appeal, the Maryland Court of Appeals affirmed the 10-day order, but reversed the 10-month order on the ground that "the period of time was unreasonable and that it was arbitrary to assume that a clear and present

bring your friends, come back tomorrow night. . . . Come on back tomorrow night, let's raise a little bit of hell for the white race."

[2] Maryland Rule of Procedure BB72.

[3] The text of the Writ of Injunction is as follows:

"We command and strictly enjoin and prohibit you the said Joseph Carroll, Richard Norton, J. B. Stoner, Connie Lynch, Robert Lyons, William Brailsford and National States Rights Party from holding rallies or meetings in Somerset County which will tend to disturb and endanger the citizens of the County and to enjoin you, the said defendants, from using and operating or causing to be operated within the County any devices or apparatus for the application [sic] of the human voice or records from any radio, phonograph or other sound making or producing device thereby disturbing the tranquility of the populace of the County, until the matter can be heard and determined in equity, or for a period of ten days from the date hereof.

"Hereof, fail not, as you will act to the contrary at your peril."

danger of civil disturbance and riot would persist for ten months."

Petitioners sought review by this Court, under 28 U. S. C. § 1257 (3), asserting that the case is not moot and that the decision of the Maryland Court of Appeals continues to have an adverse effect upon petitioners' rights. We granted certiorari.

We agree with petitioners that the case is not moot. Since 1966, petitioners have sought to continue their activities, including the holding of rallies in Princess Anne and Somerset County, and it appears that the decision of the Maryland Court of Appeals continues to play a substantial role in the response of officials to their activities.[4] In these circumstances, our jurisdiction is not at an end.

This is the teaching of *Bus Employees* v. *Missouri*, 374 U. S. 74 (1963), which concerned a labor dispute which had led to state seizure of the business. This Court held that, although the seizure had been terminated, the case was not moot because "the labor dispute [which gave rise to the seizure] remains unresolved. There thus exists . . . not merely the speculative possibility of invocation of the [seizure law] in some future labor dispute, but the presence of an existing unresolved dispute which continues . . . ." *Id.*, at 78.

In *Southern Pacific Terminal Co.* v. *ICC*, 219 U. S. 498 (1911), this Court declined to hold that the case was moot although the two-year cease-and-desist order at

---

[4] Petitioners recite that they were denied the right to hold a rally in Princess Anne on July 17, 1967, and that the letter of rejection relied upon the Court of Appeals' decision. They acknowledge that on July 25, they were authorized to hold rallies in Princess Anne on July 28, 29, and 30, 1967; but they appear to complain that the permit stipulated that the sound should not be amplified for more than 250 feet, and that "you will not be permitted to use racial epithets or to make slanderous remarks about the members of any race or ethnic group."

issue had expired. It said: "The questions involved in the orders of the Interstate Commerce Commission are usually continuing . . . and their consideration ought not to be, as they might be, defeated, by short term orders, capable of repetition, yet evading review . . . ." *Id.*, at 515.

These principles are applicable to the present case. The underlying question persists and is agitated by the continuing activities and program of petitioners: whether, by what processes, and to what extent the authorities of the local governments may restrict petitioners in their rallies and public meetings.

This conclusion—that the question is not moot and ought to be adjudicated by this Court—is particularly appropriate in view of this Court's decision in *Walker* v. *Birmingham,* 388 U. S. 307 (1967). In that case, the Court held that demonstrators who had proceeded with their protest march in face of the prohibition of an injunctive order against such a march, could not defend contempt charges by asserting the unconstitutionality of the injunction. The proper procedure, it was held, was to seek judicial review of the injunction and not to disobey it, no matter how well-founded their doubts might be as to its validity. Petitioners have here pursued the course indicated by *Walker;* and in view of the continuing vitality of petitioners' grievance, we cannot say that their case is moot.

Since the Maryland Court of Appeals reversed the 10-month injunction of August 30, 1966, we do not consider that order. We turn to the constitutional problems raised by the 10-day injunctive order.

The petitioners urge that the injunction constituted a prior restraint on speech and that it therefore violated the principles of the First Amendment which are applicable to the States by virtue of the Fourteenth Amendment. In any event, they assert, it was not constitution-

ally permissible to restrain petitioners' meetings because no "clear and present danger" existed.

Respondents, however, argue that the injunctive order in this case should not be considered as a "prior restraint" because it was based upon the events of the preceding evening and was directed at preventing a continuation of those events, and that, even if considered a "prior restraint," issuance of the order was justified by the clear and present danger of riot and disorder deliberately generated by petitioners.

We need not decide the thorny problem of whether, on the facts of this case, an injunction against the announced rally could be justified. The 10-day order here must be set aside because of a basic infirmity in the procedure by which it was obtained. It was issued *ex parte,* without notice to petitioners and without any effort, however informal, to invite or permit their participation in the proceedings. There is a place in our jurisprudence for *ex parte* issuance, without notice, of temporary restraining orders of short duration; but there is no place within the area of basic freedoms guaranteed by the First Amendment for such orders where no showing is made that it is impossible to serve or to notify the opposing parties and to give them an opportunity to participate.

We do not here challenge the principle that there are special, limited circumstances in which speech is so interlaced with burgeoning violence that it is not protected by the broad guarantee of the First Amendment. In *Cantwell* v. *Connecticut,* 310 U. S. 296, at 308 (1940), this Court said that "[n]o one would have the hardihood to suggest that the principle of freedom of speech sanctions incitement to riot." See also *Chaplinsky* v. *New Hampshire,* 315 U. S. 568, 572 (1942); *Milk Wagon Drivers Union* v. *Meadowmoor Dairies,* 312 U. S. 287, 294 (1941). Ordinarily, the State's constitutionally permissible interests are adequately served by criminal

penalties imposed after freedom to speak has been so grossly abused that its immunity is breached. The impact and consequences of subsequent punishment for such abuse are materially different from those of prior restraint. Prior restraint upon speech suppresses the precise freedom which the First Amendment sought to protect against abridgment.[5]

The Court has emphasized that "[a] system of prior restraints of expression comes to this Court bearing a heavy presumption against its constitutional validity." *Bantam Books* v. *Sullivan,* 372 U. S. 58, 70 (1963); *Freedman* v. *Maryland,* 380 U. S. 51, 57 (1965). And even where this presumption might otherwise be overcome, the Court has insisted upon careful procedural provisions, designed to assure the fullest presentation and consideration of the matter which the circumstances permit. As the Court said in *Freedman* v. *Maryland, supra,* at 58, a noncriminal process of prior restraints upon expression "avoids constitutional infirmity only if it takes place under procedural safeguards designed to obviate the dangers of a censorship system."

Measured against these standards, it is clear that the 10-day restraining order in the present case, issued *ex parte,* without formal or informal notice to the petitioners or any effort to advise them of the proceeding, cannot be sustained. Cf. *Marcus* v. *Search Warrant,* 367 U. S. 717, 731 (1961); [6] *A Quantity of Books* v. *Kansas,*

---

[5].The elimination of prior restraints was a "leading purpose" in the adoption of the First Amendment. See *Lovell* v. *Griffin,* 303 U. S. 444, at 451–452 (1938).

[6] *Marcus* rejected the contention that *Kingsley Books, Inc.* v. *Brown,* 354 U. S. 436 (1957), supported "the proposition that the State may impose the extensive restraints imposed here on the distribution of these publications prior to an adversary proceeding on the issue of obscenity." 367 U. S., at 736. In *Kingsley,* a New York statute authorizing an injunction *pendente lite* against the distribution of obscene books was upheld. By statute, the person enjoined

378 U. S. 205 (1964).[7]   In the latter case, this Court disapproved a seizure of books under a Kansas statute on the basis of *ex parte* scrutiny by a judge.   The Court held that the statute was unconstitutional.   MR. JUSTICE BRENNAN, speaking for a plurality of the Court, condemned the statute for "not first affording [the seller of the books] an adversary hearing." *Id.*, at 211.   In the present case, the reasons for insisting upon an opportunity for hearing and notice, at least in the absence of a showing that reasonable efforts to notify the adverse parties were unsuccessful, are even more compelling than in cases involving allegedly obscene books.   The present case involves a rally and "political" speech in which the element of timeliness may be important.   As MR. JUSTICE HARLAN, dissenting in *A Quantity of Books* v. *Kansas*, pointed out, speaking of "political and social expression":

> "It is vital to the operation of democratic government that the citizens have facts and ideas on important issues before them.   A delay of even a day or two may be of crucial importance in some instances.   On the other hand, the subject of sex is of constant but rarely particularly topical interest."   378 U. S., at 224.

In the present case, the record discloses no reason why petitioners were not notified of the application for injunction.   They were apparently present in Princess Anne.   They had held a rally there on the night preceding the application for and issuance of the injunction. They were scheduled to have another rally on the very

---

could get a hearing "within one day after joinder of issue."   The New York courts have subsequently held that no *ex parte* injunction may be issued under the statute.   *Tenney* v. *Liberty News Distribs., Inc.*, 13 App. Div. 2d 770, 215 N. Y. S. 2d 663 (1961).

[7] Compare the considerations leading to the Norris-LaGuardia Act, 47 Stat. 70, 29 U. S. C. §§ 101–115.   See F. Frankfurter & N. Greene, The Labor Injunction 200–205 (1930).

evening of the day when the injunction was issued.[8]   And some of them were actually served with the writ of injunction at 6:10 that evening.   In these circumstances, there is no justification for the *ex parte* character of the proceedings in the sensitive area of First Amendment rights.

The value of a judicial proceeding, as against self-help by the police, is substantially diluted where the process is *ex parte,* because the Court does not have available the fundamental instrument for judicial judgment: an adversary proceeding in which both parties may participate.   The facts in any case involving a public demonstration are difficult to ascertain and even more difficult to evaluate.   Judgment as to whether the facts justify the use of the drastic power of injunction necessarily turns on subtle and controversial considerations and upon a delicate assessment of the particular situation in light of legal standards which are inescapably imprecise.[9] In the absence of evidence and argument offered by both sides and of their participation in the formulation of value judgments, there is insufficient assurance of the balanced analysis and careful conclusions which are essential in the area of First Amendment adjudication.[10]

The same is true of the fashioning of the order. An order issued in the area of First Amendment rights must be couched in the narrowest terms that will accomplish the pin-pointed objective permitted by constitutional mandate and the essential needs of the public order.   In this sensitive field, the State may not employ

---

[8] The petition for the temporary injunction recited that Carroll and the others against whom the injunction was sought "are presently in Somerset or Wicomico Counties of the State of Maryland."

[9] Cf. Frankfurter & Greene, The Labor Injunction, *supra.*

[10] There is a danger in relying exclusively on the version of events and dangers presented by prosecuting officials, because of their special interest. *Freedman* v. *Maryland, supra,* at 57–58.

"means that broadly stifle fundamental personal liberties when the end can be more narrowly achieved." *Shelton v. Tucker*, 364 U. S. 479, 488 (1960). In other words, the order must be tailored as precisely as possible to the exact needs of the case. The participation of both sides is necessary for this purpose.[11] Certainly, the failure to invite participation of the party seeking to exercise First Amendment rights reduces the possibility of a narrowly drawn order, and substantially imperils the protection which the Amendment seeks to assure.

Finally, respondents urge that the failure to give notice and an opportunity for hearing should not be considered to invalidate the order because, under Maryland procedure, petitioners might have obtained a hearing on not more than two days' notice. Maryland Rule of Procedure BB72. But this procedural right does not overcome the infirmity in the absence of a showing of justification for the *ex parte* nature of the proceedings. The issuance of an injunction which aborts a scheduled rally or public meeting, even if the restraint is of short duration, is a matter of importance and consequence in view of the First Amendment's imperative. The denial of a basic procedural right in these circumstances is not excused by the availability of post-issuance procedure which could not possibly serve to rescue the August 7 meeting, but, at best, could have shortened the period in which petitioners were prevented from holding a rally.

We need not here decide that it is impossible for circumstances to arise in which the issuance of an *ex parte* restraining order for a minimum period could be justified

---

[11] Cf. *Williams* v. *Wallace*, 240 F. Supp. 100 (D. C. M. D. Ala. 1965). There District Judge Johnson initially refused to issue an injunction *ex parte* against the absent state officials. Then, after a hearing at which the plaintiffs submitted a detailed plan for their proposed Selma-Montgomery march, he enjoined the State from interfering with the march as proposed in the plan.

because of the unavailability of the adverse parties or their counsel, or perhaps for other reasons. In the present case, it is clear that the failure to give notice, formal or informal, and to provide an opportunity for an adversary proceeding before the holding of the rally was restrained, is incompatible with the First Amendment. Because we reverse the judgment below on this basis, we need not and do not decide whether the facts in this case provided a constitutionally permissible basis for temporarily enjoining the holding of the August 7 rally.

*Reversed.*

MR. JUSTICE BLACK concurs in the result.

MR. JUSTICE DOUGLAS, while joining the opinion of the Court, adheres to his dissent in *Kingsley Books, Inc.* v. *Brown,* 354 U. S. 436, 446–447, and to his concurring opinion in *Freedman* v. *Maryland,* 380 U. S. 51, 61–62.