**David L. MOLPUS et al., Plaintiffs-Appellees, Cross-Appellants,**

v.

**Porter L. FORTUNE, Jr., et al., Defendants-Appellants, Cross-Appellees.**

No. 29659.

United States Court of Appeals, Fifth Circuit.

Oct. 5, 1970.

See also 431 F.2d 799.

A. F. Summer, Atty. Gen. of Mississippi, William A. Allain, Asst. Atty. Gen., Ed Davis Noble, Jr., James E. Rankin, Special Asst. Attys. Gen., Jackson, Miss., Will A. Hickman, Special Counsel, Oxford, Miss., for defendants-appellants.

Douglas C. Wynn, J. Wesley Watkins, III, Eugene M. Bogen, Fred C. DeLong, Jr., James L. Robertson, Greenville, Miss., for plaintiffs-appellees.

Before JOHN R. BROWN, Chief Judge, GOLDBERG and CLARK, Circuit Judges.

## JOHN R. BROWN, Chief Judge:

This case adds another chapter to the ever-expanding volume of Mississippi speaker ban litigation [1] which culminated in Stacy v. Williams, 1969, N.D.Miss., 306 F.2d Supp. 963.[2] Our task here is not as broad as the *Stacy* deliverance for our duty is not to review *Stacy* but only to apply it.

For years there has been a continuing rankle between some students and organizations and the Board of Trustees of the University of Mississippi over who could and who could not speak on campus. Finally on January 14, 1969 a 3-Judge District Court convened pursuant to 28 U.S.C.A. § 2281 to determine the constitutional fate of speaker regulations which had been adopted by the Board from 1955 to 1968. In a massive sweep, that Court cut them all down. The Court then gave the University administration sixty days to propose new rules consistent with constitutional guarantees. On March 10 the University submitted its proposed standards.

Finding that the new regulations were no improvement on the old, the 3-Judge Court again overturned practically all of the Board's suggestions. Stacy v. Williams, *supra.* But this time the Court felt that the administration had been given enough chances to comply. So the Court took it upon itself to promulgate the code that would henceforth determine the rights of students and administration in the determination of speakers on state campuses. These regulations—which were accepted without appeal—are of such importance that they bear repetition in full:

*"Uniform Regulations For Off-Campus Speakers Invited By Organized Student And Faculty Groups Applicable To All Institutions Of Higher Learning Within The State Of Mississippi*

The freedoms of speech and assembly guaranteed by the first and fourteenth amendments to the United States Constitution shall be enjoyed by the students and faculties of the several Institutions of Higher Learning of the State of Mississippi as respects the opportunity to hear off-campus, or outside, speakers on the various campuses. Free discussion of subjects of either controversial or non-controversial nature shall not be curtailed.

However, as there is no absolute right to assemble or to make or hear a speech at any time or place regardless of the circumstances, content of speech, purpose of assembly, or probable consequences of such meeting or speech, the issuance of invitations to outside speakers shall be

---

1. This case is symptomatic of the increasing caseload dealing with constitutional rights in a university setting. See, e. g., Bayless v. Martine, 5 Cir., 1970, 430 F.2d 873; Ferguson v. Thomas, 5 Cir., 1970, 430 F. 2d 852.

2. For an historical overview of the problem, see *Stacy*, Mississippi's Campus Speaker Ban: Constitutional Considerations and the Academic Freedom of Students, 38 Miss.L.Rev. 488 (1967). The author of the article was the Stacy of Stacy v. Williams, *supra.* Prior speaker ban incidents concerned such people as Charles Evers, Aaron Henry, and Dr. Earl Reynolds.

limited in the following particulars, but only in the manner set forth herein:

(1) A request to invite an outside speaker will be considered only when made by an organized student or faculty group, recognized by the head of the college or university;

(2) No invitation by such organized group shall issue to an outside speaker without prior written concurrence by the head of the institution, or such person or committee as may be designated by him (hereafter referred to as his authorized designee), for scheduling of speaker dates and assignment of campus facilities;

(3) Any speaker request shall be made in writing by an officer of the student or faculty organization desiring to sponsor the proposed speaker not later than ten calendar days prior to the date of the proposed speaking engagement. This request shall contain the name of the sponsoring organization, the proposed date, time and location of the meeting, the expected size of the audience and topic of speech. Any request not acted upon by the head of the institution, or his authorized designee, within four days after submission shall be deemed granted;

(4) A request made by a recognized organization may be denied only if the head of the institution, or his authorized designee determines, after proper inquiry, that the proposed speech will constitute a clear and present danger to the institution's orderly operation by the speaker's advocacy [1] of such actions as:

1. Advocacy, as described above, means preparing the group addressed for imminent action and steeling it to such action, as opposed to the abstract espousal of the moral propriety of a course of action by resort to force; and there must be not only advocacy to action but also a reasonable apprehension of imminent danger to the essential functions and purposes of the institution.

1. The violent overthrow of the government of the United States, the State of Mississippi, or any political subdivision thereof; or

2. The willful damage or destruction, or seizure and subversion, of the institution's buildings or other property; or

3. The forcible disruption or impairment of, or interference with, the institution's regularly scheduled classes or other educational functions; or

4. The physical harm, coercion, intimidation, or other invasion of lawful rights, of the institution's officials, faculty members or students; or

5. Other campus disorder of a violent nature.

In determining the existence of a clear and present danger, the head of the institution, or his authorized designee, may consider all relevant factors, including whether such speaker has, within the past five years, incited violence resulting in the destruction of property at any state educational institution or has willfully caused the forcible disruption of regularly scheduled classes or other educational functions at any such institution.

(5) Where the request for an outside speaker is denied, any sponsoring organization thereby aggrieved shall upon written application to the head of the institution, or his authorized designee, obtain a hearing within two days following the filing of its appeal before a Campus Review Committee, composed of three faculty members and two students of the institution, for a de novo consideration of the request. The Campus Review Committee shall have power to grant or deny the request; and its decision shall be final, unless judicial review is sought as hereinafter provided. If such request is neither granted nor denied within said two-day period, it shall be deemed granted, and the speaker's invitation shall issue. The three faculty members to serve on the Campus Review Committee shall be appointed at each institution for a one-year term beginning September 1 of each calendar year, and this appointment shall be made by the President of the Board of Trustees of the

Institutions of Higher Learning. The two student members on the Campus Review Committee shall be the president and secretary of the student body of each institution, and they shall serve only as long as they hold those student offices.

Any sponsoring organization aggrieved by the action of the Campus Review Committee in denying the request may obtain judicial review thereof upon application to any court of competent jurisdiction, state or federal, by presenting its verified petition setting forth the grounds of complaint and giving adequate notice of such filing to the head of the institution. Upon a hearing to be conducted as soon as practicable, and at such time and place as the court may prescribe, the court shall either reverse or affirm the decision of the Campus Review Committee as may be proper under the law and facts.

(6) Where the request for an outside speaker is granted and the speaker accepts the invitation, the sponsoring organization shall inform the head of the institution, or his authorized designee, in writing immediately of such acceptance. The head of the institution, or his authorized designee, may, in his discretion, require that the meeting be chaired by a member of the administration or faculty, and he may further require a statement to be made at the meeting that the views presented are not necessarily those of the institution or of the sponsoring group. By his acceptance of the invitation to speak, the speaker shall assume full reponsibility for any violation of law committed by him while he is on campus." *Stacy, supra,* at 979–980.

It was not long before the students at Ole Miss sought to put the *Stacy* rules into effect, and this case presents the first Court test of *Stacy*. Believing that the District Court has passed in all respects, we affirm.

In February, 1970 there was a major confrontation between students and administrators at Mississippi Valley State College (MVSC) at Itta Bena, Mississip-

pi. The result was that eight hundred students were arrested and that a student boycott closed down the school for the rest of the semester. The events provoked great comment and controversy by the students and citizens of the State of Mississippi. It was in this setting that the University of Mississippi Young Democrats (UMYD) decided to ask Tyrone Gettis, President of the student body at MVSC and leader of the confrontation, to appear on the Oxford Campus to deliver a speech on the students' side of "The Crisis at MVSC". The students also invited the President of MVSC to give the administration's point of view.

Pursuant to the *Stacy* rules, the UMYD formally requested permission to bring Mr. Gettis to the campus for the speaking engagement. Defendant Fortune, Chancellor of the University, denied the request. Under *Stacy* Rule 5, the students appealed the adverse ruling to the Campus Review Committee. The Committee rejected the request by a vote of 4 to 1. Having exhausted the intra-University remedies provided in *Stacy*, Plaintiffs sought to avail themselves of the judicial remedies that *Stacy* provided. Thus under *Stacy* Rule 5, they brought this class action in Federal District Court on March 9 to review the actions of the Review Committee. The complaint alleged at some length that the speech would pass the clear and present danger standard of *Stacy* Rule 4. Plaintiffs asked also that certain procedures be established for future meetings of the Review Committee, that the University be barred from interfering with future speakers on the campus, and that Plaintiffs be awarded attorney's fees. After an extensive evidentiary hearing, the District Court on March 31, 1970 by opinion and order directed that the speech be allowed to take place. The Court also found that the burden of proof in these cases would rest upon the University to show by clear and convincing evidence that this speech or any speech would constitute a clear and present danger to the University's continued operation and that the University had failed to

meet the burden here. But because the case was begun to enforce and to apply *Stacy*, the District Court refused to grant Plaintiffs' request that University officials be thereafter prohibited from interfering with the rights of students to select speakers unless the University first brought Court action to show why a given speaker should not be allowed to appear. Likewise the Court declined to establish guidelines by which future meetings of the Campus Review Committee were to be held and to grant attorney's fees.

The District Court on April 6 denied a University motion to stay the order pending appeal on the grounds that "a stay would be tantamount to denying the plaintiffs the right which they seek, because it would be impossible to perfect this appeal and for this appeal to be heard and decided in time for Mr. Gettis to make his speech at the University on this very timely subject" which, after an interim stay, was affirmed by a panel of this Court. Fortune v. Molpus, 5 Cir., 1970, 431 F.2d 799.

The University has appealed, urging simply that its actions have passed the clear and present danger test. On cross appeal, Plaintiffs not only request the extensive relief asked for below but also throw in a few more things for good measure. Basically, having successfully invoked *Stacy*, they now ask that we (i) review it and (ii) on review hold it deficient if not incorrect. Thus Plaintiffs urge that the clear and present danger

standards set up in *Stacy* Rule 4 are inapplicable in First Amendment speaker ban cases. What they apparently seek is a "more stringent" requirement so that the University would have to overcome a greater burden than *Stacy* imposes.[3] But as we point out below, the University failed to satisfy even the "clear and present danger" test so in responding to this appeal Plaintiffs are not in a position to obtain a holding that a more stringent test should have been applied which, obviously, was even less satisfied by the University.[4]

Likewise, Plaintiffs renew the request for a broad, permanent injunction against the University. They seek a new "modus operandi" patterned after our *Singleton III* opinion, Singleton v. Jackson Municipal Separate School District, 5 Cir., 1970, 419 F.2d 1211. That is, the burden of litigation should shift to the University. All speakers should be allowed on campus unless the Board of Trustees institutes court action to show why a particular speaker should not be allowed. And as part of this new procedure, the Board should incur the legal expenses for both sides.

And finally Plaintiffs seize upon this cross appeal to get us to establish standards of administrative due process to deal with future hearings before the Campus Review Committee. For example, they ask that a transcript of the evidentiary hearing be taken and distributed, that all parties be represented by counsel, that all parties have the right to cross-examine witnesses, and that the Committee be

3. "If this Court has not silently abandoned its longstanding test and substituted for the purposes of this case an unexpressed but more stringent test the action of the State would have to be sustained." Terminiello v. Chicago, 1949, 337 U.S. 1, 26, 69 S.Ct. 894, 905, 93 L.Ed. 1131, 1145 (dissenting opinion of Mr. Justice Jackson). And the doctrine of clear and present danger may be something less than clear today. *See* Strong, 50 Years of "Clear and Present Danger"; From Schenck to Brandenburg—and Beyond, 1969 Supreme Court Review 41.

4. Similarly Plaintiffs seek an express holding of the correctness of the District Court

ruling that the burden for showing a danger be placed on the Defendants. Plaintiffs analogize to Carroll v. President and Commissioners of Princess Anne, 1968, 393 U.S. 175, 89 S.Ct. 347, 21 L.Ed.2d 325; Freedman v. Maryland, 1965, 380 U.S. 51, 85 S.Ct. 734, 13 L.Ed.2d 649 and Bantam Books, Inc. v. Sullivan, 1963, 372 U.S. 58, 83 S.Ct. 631, 9 L.Ed.2d 584 holding that prior restraints on speech are presumptively invalid. But Defendants do not challenge the imposition of the burden and argue the case from the standpoint that they have met the burden. Hence the issue need not be resolved.

required to file written opinions stating the specific reason for denying a speaker access to the campus.

But intriguing as these questions are we agree with the Court below that they are not for decision on this record. Plaintiffs asked for *Stacy* relief and got it. The District Judge refused to go further because he felt that his Court lacked jurisdiction to entertain what was essentially an appeal of *Stacy*.[5] Until action is begun seeking appropriate relief which challenges *Stacy* it is not for us in this posture to assay *Stacy*. And an ideal place to begin is in the *Stacy* Court itself.[6]

The District Court here properly perceived its role under the invoked regulations to determine whether the *Stacy* rules had been followed in this particular case. On those standards, the District Court did what it was supposed to do—it determined that the facts did not justify a *Stacy* finding that a clear and present danger existed and that therefore the Administration could not keep Mr. Gettis off the campus.

The role of this Court is now even more restricted. Rather than going into all the fascinating free speech issues that Plaintiffs argue with understandable fervor, we are confined to the more prosaic task of deciding whether the finding on clear and present danger is clearly erroneous, for the existence of a danger is a question of fact. F.R.Civ.P. 52(a). And a review of the record convinces us that the Trial Judge had ample basis for finding that such a danger did not exist.[7]

Affirmed.

---

5. The action below might also be construed as the disposal of an issue on factual rather than on constitutional grounds. But an inquiry into the rationale of the Trial Court decision is irrelevant in the sense that we review orders and actions, not reasons independently of actions.

6. The *Stacy* Court realized that problems might arise for in its decree it stated that the "court retain[s] jurisdiction for the enforcement of this Order and all matters relating thereto."

7. The District Court more than adequately summarized the factual backdrop of the case.

   "The evidence shows that Tyrone Gettis has been or is now the president of the student body of the Mississippi Valley State College. The student body of the college is all black. Mr. Gettis is a member of the Negro race.

   Prior to the disruptions at the college, hereafter mentioned, the enrollment was approximately two thousand students. During the months of January and February 1970, the student body staged almost continuous demonstrations in support of numerous demands made by them upon college officials. It is not necessary to detail the nature and extent of the demonstrations except to say that as a result of the student's boycott of classes and demonstrations the officials closed the college for a time. Later the college was opened for new registration. As a result of the action by college officials a large number of students did not return to school.

   Mr. Gettis was a leader in the student revolt, and assumed an active part therein. On one occasion a faculty meeting at the college was interrupted. Mr. Gettis is shown to have used abusive language toward one of the officials. On other occasion, the students forceably occupied a building on the campus and held a meeting there. Mr. Gettis is shown to have threatened a campus police officer with bodily harm. Rocks were thrown on occasions. The students stopped an automobile and tried to turn it over. It is sufficient to say that there were numerous incidents of campus disorder and interruption of regularly scheduled classes and other educational functions. Some of the college property was damaged, though only to a slight degree.

   The evidence did not show that Mr. Gettis personally destroyed or damaged any property, or harmed any person. It was shown, however, in fact, admitted by plaintiffs, that Mr. Gettis was one of the leaders of the demonstrations, and the student revolt.

   The University of Mississippi has a student body in excess of six thousand students, of which not more than two hundred are black students.

   There has not been a disturbance of major importance on the University campus since the Meredith incident in the early sixties. However, a short time before Chancellor Fortune received the first request from UMYD for Mr. Gettis to speak on the campus, there were two or three incidents of a minor nature involving black students. On one occasion a

concert or musical at the coliseum was interrupted by black students. These students went uninvited upon the stage. At about that same time a group of black students appeared on the Chancellor's lawn demanding an audience with him. Some of the students in the group used profane and obscene language. These incidents indicated unrest among the black students on the campus.

When the first request for Mr. Gettis to speak on the campus was received by Chancellor Fortune, he was aware of the unrest of the black students, on the campus. He initiated an investigation of Mr. Gettis in order to determine whether the request should be honored. Newspaper clippings concerning the incidents on the campus of Mississippi Valley State College were obtained and reviewed. Chancellor Fortune talked with college officials about the matter. After reviewing the evidence received from these sources, Chancellor Fortune determined that the proposed speech of Mr. Gettis, would constitute a clear and present danger to the University's orderly operation in the particulars above outlined especially in view of the black student unrest.

The evidence shows that before UMYD initiated the request one of the attorneys of UMYD visited Mr. Gettis at Itta Bena and talked with him about the proposed speech. Mr. Gettis intended to speak on a student's viewpoint of the crisis existing at Mississippi Valley State College. The members of the UMYD were interested in having a first hand report of the matter. The revolt had been given wide newspaper, radio and television coverage. Mr. Gettis assured the attorney that his speech would be devoted entirely to the assigned subject.

Thereafter, several of the members of the UMYD talked with Mr. Gettis by telephone and were given the same assurance. One member of the group visited the campus of Mississippi Valley State College to evaluate the problem first hand.

At the hearing the plaintiffs introduced, as witnesses, the above mentioned attortorney and three members of UMYD who testified to facts substantially as hereinbefore stated. They also introduced as witnesses a student member of the Old Miss M Club (football), who is not a member of UMYD, one of the leaders of the black students at the University and three members of the University faculty. One of the faculty members is a professor of English at the University, and the other two are professors in the School of Law. Each witness testified that he was conversant with the situation at the University and, in his opinion, the appearance of Mr. Gettis on the campus would not in any manner constitute a clear and present danger to the orderly operation of the University.

The defendants introduced the vice-president of the Mississippi Valley State College, a member of the college campus police force, and Chancellor Fortune as witnesses to sustain the viewpoint of the University. Chancellor Fortune testified in regard to the investigation of Mr. Gettis by his office, and gave his reasons for arriving at the conclusion that the request of UMYD to invite Mr. Gettis to the campus should not be approved. Chancellor Fortune determined that the proposed speech by Mr. Gettis would constitute a clear and present danger to the University's orderly operation in the particulars above mentioned. Chancellor Fortune was not fearful that Mr. Gettis' appearance on the campus would result in disorders such as occurred at Mississippi Valley State College. He testified that he was fully cognizant of the fact that the student body at the University involved a much larger group than did that at Mississippi Valley State College, and that only a few of the students at the University were black, while all of the students at the college were black students. Chancellor Fortune expressed the opinion that the University had ample resources to control any disorder which might occur on the campus. Chancellor Fortune's main concern was to avoid a disturbance of any nature.

The vice-president and police officer from Mississippi Valley State College testified in regard to the campus revolt of which Mr. Gettis was one of the leaders.

&ast; &ast; &ast; &ast; &ast;

It appears clear * * * that Mr. Gettis' appearance on the campus would not present a clear and present danger to the orderly operation of the University. In the first place, Mr. Gettis proposes to limit his speech to a discussion of the crisis at Mississippi Valley State College, as viewed by him as a student leader. However, should Mr. Gettis extend his remarks so as to advocate the destruction or damage of University property, or the seizure of is buildings, or other campus disorder of a violent nature, there does not appear to be a reasonable probability that such would happen. This conclusion is especially true when the probability is viewed in the light of the nature and racial composition of the student body at the University."

This section of the District Court's opinion is reprinted in Fortune v. Molpus, 5 Cir., 1970, 431 F.2d 799, 801, n. 3.