**Melvin WHITE EAGLE, Chairman, et al., Appellants,**

**v.**

**Philomene ONE FEATHER et al., Appellees.**

**No. 72–1706.**

United States Court of Appeals, Eighth Circuit.

Submitted April 13, 1973.

Decided May 10, 1973.

Marvin J. Sonosky, Washington, D. C., for appellants.

Before LAY and STEPHENSON, Circuit Judges, and TALBOT SMITH,* District Judge.

* Hon. Talbot Smith, United States Senior District Judge, Eastern District of Michigan, sitting by designation.

PER CURIAM.

The action before us was brought by enrolled members of the Standing Rock Sioux Indian tribes against the Tribal Council and its Chairman, Melvin White Eagle, seeking an order enjoining a general tribal election and requiring reapportionment of the elective districts of the Standing Rock Indian Reservation. It was alleged that substantial population variances existed between the districts, that such districts did not "fairly and accurately represent the population distribution of said reservation," and that under the Indian Civil Rights Act [1] particularly paragraph B thereof ("No Indian tribe . . . shall . . . deny to any person within its jurisdiction the equal protection of its laws or deprive any person of liberty or property without due process of law;") the one-man one-vote principle of Baker v. Carr, 369 U.S. 186, 82 S.Ct. 691, 7 L.Ed. 2d 663 (1962) should be applied in the situation presented.

The defendants herein deny the applicability of the principle to tribal elections. This is the principal issue in the case, not only on substantive but also on jurisdictional grounds.

The general election had been scheduled for Wednesday, September 27, 1972. On Monday, September 25, counsel for plaintiffs presented himself ex parte to the District Judge, and upon the representations made, and the pleadings presented, the court on the following morning issued a temporary restraining order enjoining the general election scheduled for the following day. It now appears that certain essential representations, as made to and relied upon by the court, were misleading and, in fact, erroneous. Were this temporary restraining order before us on some permissible theory [2] we would not hesitate to set it aside because of its procedural infirmities.[3]

1. 25 U.S.C. § 1302.

2. cf. 7 Moore's Federal Practice, 2nd Ed., § 65.07, pp. 65–83.

3. Rule 65, Federal Rules of Civil Procedure.

But the order no longer affects the defendants. A full hearing on the issuance of a preliminary injunction has been had and, although the restraining order is now attacked collaterally, it is moot and we will not discuss it in further detail.

Nevertheless, by way of dictum, we point out that in the case of Carroll v. President and Commissioners of Princess Anne, 393 U.S. 175, 89 S.Ct. 347, 21 L.Ed.2d 325 (1968), the Court stated:

> We need not decide the thorny problem of whether, on the facts of this case, an injunction against the announced rally could be justified. The 10-day order here must be set aside because of a basic infirmity in the procedure by which it was obtained. It was issued ex parte, without notice to petitioners and without any effort, however informal, to invite or permit their participation in the proceedings. There is a place in our jurisprudence for ex parte issuance, without notice, of temporary restraining orders of short duration; but there is no place within the area of basic freedoms guaranteed by the First Amendment for such orders where no showing is made that it is impossible to serve or to notify the opposing parties and to give them an opportunity to participate. 393 U.S., at 180, 89 S.Ct. at 351.

We turn, then, to a consideration of the equal protection clause of the "Constitutional Rights" section (§ 1302) of the Indian Civil Rights Act, codified at 25 U.S.C.A. §§ 1302, 1303 (Supp.1969), enacted in 1968 as part of the Civil Rights Act. The question for our consideration is the scope and meaning of the Congressional use of well-known constitutional terms, such as, here "the equal protection of its laws," within the setting of the culture and ethnical background of the Indian tribes.[4]

4. The literature in this area, most of recent origin, is abundant and helpful. See, generally, Brophy and Aberle, The Indian: America's Unfinished Business (1966); U. S. Solicitor for the Department of the Interior, Federal Indian Law

The Indian Civil Rights Act was the result of several years of hearings respecting the Indian problem. It gave to the federal courts, for the first time, a broad power of intervention in the tribal government and tribal courts. Prior thereto "The civil liberties of the Indians in relation to their tribal governments" had been uncertain, in view of the fact that tribal governments possessed "a measure of quasi-sovereignty [and were] not directly subject to the Constitutional Bill of Rights."[5] The Act before us sought solution to this problem. Senator Ervin, sponsor of the Act, described the bill in part as follows:—

"It [the bill] gives the Senate an opportunity to show whether it believes in constitutional rights for the red man.

The reservation Indian now has no Constitutional rights. The purpose of the amendment is to give these Indians constitutional rights which other Americans enjoy."[6]

We note that fears have been expressed that the Act may dispose the courts "to apply broadly such elusive and expanding concepts as due process, equal protection, or unreasonable search and seizure without a sensitive regard for their impact on tribal structures and val-

ues,"[7] and the appellant before us reflect such concern. We are aware, however, from the legislative history of the Act that no arbitrary application of the language of the Act was intended. The point is made clear, moreover, in Groundhog v. Keeler, 442 F.2d 674 (10th Cir. 1971) wherein it was held that

"Such report [of the Senate Subcommittee on the Judiciary] makes it clear that Congress intended that the provisions of the Fifteenth Amendment, certain procedural provisions of the Fifth, Sixth, and Seventh Amendments, and *in some respects* the equal protection requirement of the Fourteenth Amendment should not be embraced in the Indian Bill of Rights." (Emphasis ours) 442 F.2d at 682.

The particular clause of the Act before us requiring interpretation, as we have noted, is the equal protection clause. Appellant is correct in arguing that it does not here embrace in entirety all of its content in our applicable constitutional law. Thus we note that the Congressional hearings elicited information concerning practices of tribal governments at variance with the Anglo-American tradition. ". . . [M]ention was made [in the hearings] of the ethnic restrictions on tribal membership, and the committee was informed of other ethnic-

(1968); The Indian Bill of Rights and the Constitutional Status of Indian Governments, 82 Harv.L.Rev. 1343 (1969); Coulter Federal Law and Indian Tribal Law: The Right to Civil Counsel and the 1968 Indian Bill of Rights, 3 Colum. Human Rights Law Review 49 (1971); Reiblich: Indian Rights under the Civil Rights Act of 1968, 10 Arizona Law Review 617 (1968); Burnett, An Historical Analysis of the 1968 "Indian Civil Rights" Act, 9 Harvard Journal on Legislation 557 (1972); Indian Law Symposium, 48 N.D.L.Rev., summer 1972; A symposium, The Law and the American Indian, 33 Mont.L.Rev., summer 1972; Jury Composition—The Purposeful Inclusion of American Indians, 16 S.D.L.R. 214 (1971); Constitutional Implications of an Indian Defendant's Right to a Lesser-Included Offense Instruction, 16 S.D.L.R. 468 (1971); Clayton: Indian Jurisdiction and Related Double Jeopardy Ques-

tions, 17 S.D.L.R. 341 (1972). References to other sources will be found in the above, particularly the Harvard Law Review Discussion.

5. Coulter:—"Federal Law and Indian Tribal Law: The Right to Civil Counsel and the 1968 Indian Bill of Rights," 3 Columbia Survey of Human Rights Law 49 (1970–71).

6. 114 Cong.Rec. 5836 (1968). See, also Senate Rep. No. 841, 90th Cong., 1st Sess. at 6 (1967): "The purpose of S. 1843, as amended, is to insure that the American Indian is afforded the broad Constitutional rights secured to other Arericans. . . . The purpose of Title I is to protect individual Indians from arbitrary and unjust actions of tribal governments."

7. Barnett: An Historical Analysis of the 1968 "Indian Civil Rights" Act, 9 Harvard Journal of Legislation 557 (1972).

distinction practices. A minimum percentage of Indian blood has been made a prerequisite for inheriting rights in tribally controlled property within the reservation and for voting in tribal elections." [8]

Appellant urges, as well, that the equal protection clause should "not apply to tribal elections because there was no intent to interfere with tribal elections or office holdings," citing Groundhog v. Keeler, *supra*. But the principal issue in *Groundhog* involved the Presidential appointment of the Principal Chief of the Cherokee Tribe and the court was careful to point out that the allegations of the complaint stated no facts showing a violation of the equal protection clause.

We need not explore upon this record the degree to which federal courts may assert jurisdiction over tribal elections in all circumstances. Our problem has no such complexities as tribal 'membership or blood lines. The tribe itself, in the case before us, has established voting procedures precisely paralleling those commonly found in our culture, if not taken verbatim therefrom. The Constitution of the Standing Rock Sioux Tribe provides as follows:

"Article II—Tribal Elections

Section 1. Any enrolled member of the tribe at least eighteen (21) [9] years of age and resident in the district in which he votes for at least thirty (30 days) immediately prior to the date of the election shall be qualified to vote."

The Constitution then goes on (Section 2) to fix the date of tribal elections, to prescribe election by "secret ballot" of councilmen (Section 3), and to provide for the election by the voters of the Tribal Chairman (Section 4), as well as other relevant matters.

Here, then, we have no problem of forcing an alien culture, with strange procedures, on this tribe. What the plaintiffs seek is merely a fair compliance with the tribe's own voting procedures in accordance with the principles of Baker v. Carr, *supra*, and subsequent cases. The language of the equal protection clause in the Act is clear, its meaning (in this context) is clear, its employment subsequent to the decision in Baker v. Carr, *supra*, has its own significance, and we can find nothing (and have been cited to nothing) in the legislative history of the Act, or, indeed, the tribal customs and culture manifesting the inapplicability of the principle. The plaintiffs are entitled to the relief they seek. The cases of Groundhog v. Keeler, *supra*, and Slattery v. Arapahoe Tribal Council, 453 F.2d 278 (10th Cir. 1971) contain nothing at variance with these views upon our construction of the equal protection clause.

■ The defendants' arguments respecting jurisdiction and parties defendant do not warrant extensive discussion. So far as the naming, and joinder, of the Tribal Council and its Chairman are concerned, we agree with the District Court that in view of the provisions of the Constitution of the Standing Rock Sioux Tribe they are proper parties to the action.[10] And once the applicability of Section 1302(8) is established as comprehending the one-man, one-vote principle of Baker v. Carr, *supra*, to the situation before us, the cause of action, appellants concede, is clearly within the jurisdiction of the District Court, Luxon v. Rosebud Sioux Tribe of South Dakota, 455 F.2d 698 (8th Cir. 1972), under 28 U.S.C. § 1343(4), here pleaded. We are not passing upon other bases of jurisdiction arguably applicable to this situation.

8. 82 Harv.L.Rev., *supra*, 1358 (footnotes omitted)

9. In the copy of the Constitution before us, the printed words "twenty-one" have been inked out and the word "eighteen" substituted therefor. No point has been made in argument or briefs of the vari-

ance now obvious between the Arabic numerals and the text and we take it to be the result of oversight.

10. Article IV, Section 1, (e) and (s) ; Article V, Section 2 re election procedures and districting.

Finally, however, as the case comes to us, we are constrained to reverse, but on narrow grounds. Appellant stresses to us that "there is no evidence of population in the record." In this respect, although the appellees urge that the voting plan for the Reservation established in 1959 and amended in 1963 "has not been substantially modified since then to reflect any population redistribution," we are left uninformed as to what such population redistribution may have been, if any. Reliance was had at trial upon figures of votes cast in the September 1971 election for Chairman of the Standing Rock Sioux Tribal Council, submitted also in affidavit form to the District Court, but the report reflects votes cast, not population figures, and the correlation between the two was problematical at best. While we recognize the intimation in the record of difficulty in obtaining population figures for the tribe, nevertheless the controlling factor, the *sine qua non*, in apportionment determinations must be that of population, Reynolds v. Sims, 377 U.S. 533, 568, 84 S.Ct. 1362, 12 L.Ed. 2d 506 (1964), as nearly as such may be determined in the light of all available sources of information. It will, of course, not be assumed that the cases mandate mathematical exactness in apportionment and it may well be that in a situation such as presented in the areas occupied by this tribe, variations from a strict population standard may be justified by the "recognition of natural or historical boundary lines," Swann v. Adams, 385 U.S. 440, 87 S.Ct. 569, 17 L.Ed.2d 501 (1967), or other "factors that are free from any taint of arbitrariness or discrimination," Roman v. Sincock, 377 U.S. 695, 710, 84 S.Ct. 1449, 1458, 12 L.Ed.2d 620 (1964). See, also, Mahan v. Howell, 410 U.S. 315, 93 S.Ct. 979, 35 L.Ed.2d 320 (1973).

It is our holding that the preliminary injunction was improvidently granted upon this record and the matter will be remanded to the District Court for further consideration in the light hereof. It was stated to this court upon oral argument that defendants had a "new plan" for presentation to the Court for its consideration. Such will be received and considered by the Court, together with any other plan or plans the court may in its discretion receive, either from those parties now of record, or from such parties as may properly be added as parties hereto, or intervenors herein, in accordance with the applicable rules. The Court will thereupon fashion with due dispatch, such relief as is appropriate under the evidence presented, may order such election or elections as may be necessary pending the adoption of a plan conforming to the requirements of the equal protection clause of 25 U.S.C. § 1302, and will retain jurisdiction of the case for the purpose of making any further order necessary or desirable for the effectuation of the clause (§ 1302) hereinabove under consideration.

Reversed and remanded for further consideration not inconsistent with the opinion herein.