J-S04044-24

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| TENTH PRESBYTERIAN CHURCH | : | IN THE SUPERIOR COURT OF |
|---|---|---|
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| PHILIP SNYDER | : | |
| | : | |
| Appellant | : | No. 1321 EDA 2023 |

Appeal from the Order Entered April 18, 2023
In the Court of Common Pleas of Philadelphia County Civil Division at
No(s):  190703016

BEFORE:  BOWES, J., STABILE, J., and LANE, J.

DISSENTING MEMORANDUM BY BOWES, J.:          **FILED MAY 31, 2024**

We have twice remanded this matter to the trial court for further factual findings concerning the scope of a preliminary injunction regarding its physical distance limitation.  My learned colleagues remand for a third time.  I respectfully dissent as I would hold that the trial court has offered sufficient facts to justify the limitation.

The Tenth Presbyterian Church ("the Church") excommunicated the appellant, Philip Snyder ("Snyder"), in 2016.  Snyder then began protesting outside a church located at 1701 Delancey Street.  Shortly thereafter, Snyder unsuccessfully sued various members of the Church and its administrators for defamation.  Following that loss, Snyder increased his protests.  His conduct prompted the Church to seek and obtain a preliminary injunction in July of 2019.  The scope of that injunction with respect to its distance limitation is before this Court for the fourth time.

The validity of the injunction is not at issue; *i.e.*, this appeal does not entail an assessment of whether Snyder's free speech rights were lawfully restricted in the first instance. Nor is the scope of the injunction at issue in terms of the conduct it proscribes. The only issue is whether the trial court offered sufficient facts to justify a 350-foot buffer zone around six Church buildings. I begin my assessment of that question with a brief overview of the factual and legal conclusions underpinning the injunction. The latest order summarizes the essential facts:

> Th[e c]ourt finds that . . . Snyder . . . has engaged in aggressive, and disruptive behavior that is harassing to employees, congregants, and the owners of [the Church]. The evidence demonstrates that Mr. Snyder's actions outside the church, frightened congregants to the point where they did not feel safe to attend church services.

Order, 4/18/23, at unnumbered 1-2. The impetus for the injunction was Snyder's verbal harassment of the Church's attendees as they made their way to services. He mailed over 100 pages of material to approximately 200 members of the Church and declared that he would not stop his activities until all of the Church's leadership resigned. Snyder also claimed that said leadership was plotting to assassinate him. The trial court credited testimony from Douglas Baker, the Church's administrator, that Snyder made specific threats. Baker testified that several members informed him that Snyder made direct threats against the Church's senior minister. Baker testified that Snyder became increasingly animated after his defamation suit failed. Following the verdict, Snyder ramped up his social media presence, posting clips of his

confrontations with church members. Snyder's protests could be heard during church services. The Church requested a preliminary injunction barring Snyder from coming within 1,000 feet of the various buildings.

The trial court granted the injunction, setting the distance at 5,000 feet. We upheld the injunction except for that restriction, which we vacated because it "places Snyder well beyond the point at which his constitutional right to protest is utterly extinguished." *Tenth Presbyterian Church v. Snyder*, 266 A.3d 640, 2021 WL 4839339, at *7 (Pa.Super. 2021) (non-precedential decision). On remand, the trial court imposed the 1,000 feet restriction originally requested by the Church as to specific properties, but its order vaguely indicated that other properties could be included. "While the order lists the street addresses of five such properties, the restriction is not necessarily limited to those specified." *Tenth Presbyterian Church v. Snyder*, 285 A.3d 917, 2022 WL 4101153, at *4 (Pa.Super. 2022) (non-precedential decision) (internal quotation marks omitted). We vacated the order, criticizing the trial court's blanket 1,000-foot ban for "disregard[ing] our prior finding that the Church's requested relief of a uniform 1,000-foot distance restriction is not sufficiently narrowly tailored to balance the congregants' ability to access Church [p]roperties with Snyder's right to free speech." *Id*. The trial court entered a new order on remand, which "shortened the distance requirement to 500 feet and made several factual findings in support of the new restriction." *Tenth Presbyterian Church v. Snyder*, 296 A.3d 569, 2023 WL 2292067, at *1 (Pa.Super. 2023) (non-

precedential decision). In support of the 500-foot limit, the trial court cited an internet search result indicating that a typical city block is between 310 and 323 feet in length. We again remanded, agreeing with Snyder that the court failed to comply with our directive.

> As noted, we asked the trial court to set forth why its 1000-foot restriction was the least necessary distance "to protect Church property, permit the congregants' and Church employees access to the Church and to hold services without distraction, with the least possible impingement on Snyder's constitutional right to convey his dissatisfaction with the Church and its leadership on public streets and sidewalks."
>
> On remand, the trial court, in setting its new distance requirement at 500 feet, did not cite any record evidence or receive any new evidence. Instead, the trial court cited its own internet research that a "typical" city block is 310 to 323 feet in length, seemingly concluding that keeping Snyder around a block-and-a-half away from the Church was the only way to ensure that his protest does not deter congregants and employees of the Church from accessing its properties.
>
> The problem with this conclusion, however, is that it is not clear what evidence the trial court is relying on for its finding that 500 feet is appropriate under the facts of this case, taking into consideration the physical layout of the Church's properties and the surrounding neighborhood. Like it failed to do before, there is no evidence that the trial court, in setting its distance requirement, weighed the physical characteristics of the Church's property and then tailored its distance requirement so that Snyder could still meaningfully protest the Church and its leadership. In the absence of such evidence in this case, we are left to conclude that the trial court's distance requirement of 500 feet—which would be well over the length of a football field—still puts Snyder's protests well out of sight of the Church and, therefore, effectively extinguishes his constitutional right to protest. Thus, like we did before, we are constrained to vacate the trial court's order with respect to its 500-foot distance requirement.

*Id*. at *6 (cleaned up).

- 4 -

The court then vacated the prior order and entered a new one, setting a distance limit of 350 feet as to the six properties, which brings us to this appeal. The Majority concludes that we must remand yet again, as the record must include "evidence which demonstrates that the distance limitation imposed by the trial court is narrowly tailored to the particular characteristics of the Church properties and the practical considerations attendant to the need to ensure safe and peaceful access by congregants and employees to those properties." Majority Memorandum at 12. Indeed, the Majority notes that the more onerous distance limitations imposed in prior orders may have been valid. *Id*. at 12 n.5 ("[A]lthough the trial court elected to reduce the distance limitation following each prior remand, those reductions might not have been necessary if the trial court had directed this Court to record evidence demonstrating that the distance limitation was narrowly tailored to the particular facts of this case."). The Majority concludes that the trial court has once again failed to follow our order to provide specific facts. Anticipating the trial court's frustration, the Majority offers some direction as to the type of facts the court should consider, such as "whether the Church has any on-site parking in which congregants and employees may park for work, meetings, services, events, functions, *etc*., and if so, whether such on-site parking is sufficient to accommodate employees and congregants." *Id*. at 12-13. If there is no on-site parking, the court "should consider how far a distance from Church properties do employees and congregants generally need to park in

order to attend work, meetings, services, events, and functions at Church properties." *Id*. at 13.

I appreciate my learned colleagues' effort to guide the trial court on remand. However, I think that we have lost sight of why we upheld the injunction and are demanding that the trial court supply a level of precision that the law does not require. I conclude that the trial court adequately balanced Snyder's right to protest against the security interests of the Church and its members. With respect to the 350-foot buffer zone, the trial court made these findings:

> 5. Th[e c]ourt also finds that a [350]. . . foot restriction upon [Snyder] from the above-mentioned properties is the least necessary to protect Church property and permit congregants as well as employees to access to both the Church and its services.
>
> 6. A restriction of [350] . . . feet will represent the lease [*sic*] possible impingement on Snyder's [c]onstitutional right to convey his dissatisfaction with the Church and its leadership on public streets and sidewalks, while [at the] same time allow employees, and congregants to access the church and grant them the ability to hold services without fear of harassment, distraction[,] or safety concerns.

Order, 4/18/23, at unnumbered 4 (footnote omitted).

The trial court concluded that the restriction will still "permit [Snyder] to continue to exercise his constitutional right to freedom of speech," while "keep[ing] him sufficient distance away from [the Church] property so as to prevent any egregious distraction[,] harassment[,] or safety concerns by congregants, employees, or owners." *Id*. at n.3. In selecting the 350-foot

requirement, the trial court "considered the specific physical characteristic of the properties[,] age[,] and lack of security infrastructure." *Id*.

I conclude that these reasons are sufficient. Snyder argues that the "trial court did not consider—and conducted no analysis—as to whether there is a distance between twenty feet and 350 feet at which Snyder's protests would no longer be heard from inside the Church." Majority Memorandum at 10. However, the trial court's justification for the restriction goes well beyond noise disturbances. The trial court specifically accepted that several churchgoers were "frightened . . . to the point where they did not feel safe to attend church services." Order, 4/18/23, at unnumbered 2. In our first decision, we explained that "orders affecting First Amendment rights 'must be tailored as precisely as possible to the exact needs of the case.'" *Tenth Presbyterian Church*, 2021 WL 4839339 at *3 (quoting *Carroll v. Comm'rs*, 393 U.S. 175, 184 (1968)). The injunction "must be couched in the narrowest terms that will accomplish the pin-pointed objective permitted by constitutional mandate and the essential needs of the public order." *Id*. (emphasis in original). I conclude that the order meets these criteria. The "pin-pointed objective" here is the safety concerns, and the validity of the 350-foot buffer zone must be considered in conjunction with that objective.

The Majority, in contrast, is focused on the language "couched in the narrowest terms," largely overlooking the "pin-pointed objective" that justified limiting Snyder's free speech rights. I appreciate the concern that the 350-foot buffer zone may not be the narrowest possible limitation. However, that

concern will always apply. Requiring the trial court to precisely specify why it went with 350 feet instead of, say, 337 feet, is a bit like trying to clearly identify when a pool of water becomes deep. In truth, there's a spectrum, and the trial court must be given some leeway. I fully agree with our prior decisions that 5,000 feet and 1,000 feet were too restrictive.[1] I am less sure about our rejection of the 500-foot buffer, but that decision is the law of the case and the trial court on remand further reduced that distance by 150 feet. The reality is that the trial court had to select a rough approximation that allowed Snyder to still convey his displeasure towards the Church while protecting the Church's members as they go about their business and attend services.

In requiring "the least possible infringement on Snyder's constitutional right to protest," Majority Memorandum at 11-12, the Majority's approach sounds like the "strict scrutiny" standard applied to content-based speech restrictions. "For the state to enforce a content-based exclusion it must show that its regulation is necessary to serve a compelling state interest and that it is narrowly drawn to achieve that end." *Perry Educ. Ass'n v. Perry Loc. Educators' Ass'n*, 460 U.S. 37, 45 (1983). But the "narrowly drawn to achieve that end" test does not apply to this injunction. Recall that in our

---

[1] This author joined the memorandum authored in the first decision, which involved the 5,000-foot restriction.

decision upholding the injunction, we cited ***Carroll*** for the appropriate standard, which states, in relevant part:

> An order issued in the area of First Amendment rights must be couched in the narrowest terms that will accomplish the pin-pointed objective permitted by constitutional mandate and the essential needs of the public order. . . . In other words, the order must be tailored as precisely as possible to the exact needs of the case.

***Carroll***, 393 U.S. at 184.

The United States Supreme Court has held that the ***Carroll*** standard is not the same as strict scrutiny. In ***Madsen v. Women's Health Ctr., Inc.***, 512 U.S. 753 (1994), the High Court dealt with a permanent injunction "which prohibits antiabortion protesters from demonstrating in certain places and in various ways outside of a health clinic that performs abortions." ***Id.*** at 757. In determining what standard applied, the Court held, "when evaluating a content-neutral injunction, we think that our standard time, place, and manner analysis is not sufficiently rigorous.[2] We must ask instead whether the challenged provisions of the injunction burden no more speech than necessary to serve a significant government interest." ***Id***. at 765.

Our prior decisions have not examined whether the injunction is content-neutral, and we unfortunately lack advocacy on this point given the

---

[2] Time, place, and manner restrictions are subject to "intermediate scrutiny." ***See Turner Broad. Sys., Inc. v. F.C.C.***, 512 U.S. 622, 642 (1994) ("[R]egulations that are unrelated to the content of speech are subject to an intermediate level of scrutiny . . . because in most cases they pose a less substantial risk of excising certain ideas or viewpoints from the public dialogue.").

limited nature of our remand orders. I conclude that the restrictions are content-neutral and thus strict scrutiny does not apply. The hallmark of a content-neutral restriction is that it is "justified without reference to the content of the regulated speech," *Virginia State Bd. of Pharmacy v. Virginia Citizens Consumer Council, Inc.*, 425 U.S. 748, 771 (1976), and that is the case here. I recognize that, by targeting Snyder as an individual, the injunction is necessarily based on the content of his protests and the viewpoint it expresses. The *Madsen* Court addressed this same point:

> An injunction, by its very nature, applies only to a particular group (or individuals) and regulates the activities, and perhaps the speech, of that group. It does so, however, because of the group's past actions in the context of a specific dispute between real parties. The parties seeking the injunction assert a violation of their rights; the court hearing the action is charged with fashioning a remedy for a specific deprivation, not with the drafting of a statute addressed to the general public.

> The fact that the injunction in the present case did not prohibit activities of those demonstrating in favor of abortion is justly attributable to the lack of any similar demonstrations by those in favor of abortion, and of any consequent request that their demonstrations be regulated by injunction. There is no suggestion in this record that Florida law would not equally restrain similar conduct directed at a target having nothing to do with abortion; none of the restrictions imposed by the court were directed at the contents of petitioner's message.

*Madsen*, 512 U.S. at 762–63.

Similarly, this injunction is due to Snyder's conduct in expressing his messages, not the content or viewpoint of the messages themselves. That point is relevant to the scope of the injunction. "An injunction is narrowly tailored to protect a significant public interest when its scope does not exceed

that which is necessary to protect the interest involved. The permissible scope of the restriction also depends on where, in the spectrum from conduct to pure speech, the speech in question lies." **Klebanoff v. McMonagle**, 552 A.2d 677, 680 (Pa.Super. 1988). We have accepted the trial court's factual findings relative to the threat posed by Snyder, and I conclude that the 350-foot restriction is narrowly tailored.

Finally, I find pertinent the **Madsen** Court's discussion of a 300-foot buffer zone. One of the conditions imposed by the injunction was that "petitioners refrain from physically approaching any person seeking services of the clinic 'unless such person indicates a desire to communicate' in an area within 300 feet of the clinic." **Madsen**, 512 U.S. at 773. The purpose was "to prevent clinic patients and staff from being 'stalked' or 'shadowed' by the petitioners as they approached the clinic." **Id**. The Court held that this restriction was invalid.

> But it is difficult, indeed, to justify a prohibition on all uninvited approaches of persons seeking the services of the clinic, regardless of how peaceful the contact may be, without burdening more speech than necessary to prevent intimidation and to ensure access to the clinic. Absent evidence that the protesters' speech is independently proscribable (*i.e.*, "fighting words" or threats), or is so infused with violence as to be indistinguishable from a threat of physical harm, this provision cannot stand.

**Id**. at 774.

In contrast, the trial court here made specific factual findings that Snyder "escalating and troubling pattern of aggression, intimidation, and threats to congregants and Church employees as they come and go from

- 11 -

services, such that many congregants fear for their safety and many no longer attend Church services." Majority Memorandum at 11. Thus, unlike the invalid buffer zone in *Madsen*, the trial court imposed a buffer zone to ensure that the Church membership could exercise their own constitutional right to freedom of religion without being subject to harassment. Furthermore, unlike the injunction in *Madsen*, which applied to certain individuals and members of specific organizations, this injunction targets Snyder in his individual capacity, and is specifically justified by his own past behavior.

Due to the safety concerns, I conclude that the 350-foot buffer zone burdens no more speech than necessary. Snyder is not prohibited from expressing his disapproval of the Church, its leadership, its members, or any other topic. Forcing him to remain 350 feet away from the property of the Church strikes a sufficient balance of Snyder's right to continue protesting and alert the public and Church of his grievances while safeguarding the Church and its members. "One may register a public protest by placing a vulgar message on his jacket and, in so doing, expose unwilling viewers. Nevertheless, that does not mean that he has an unqualified constitutional right to follow and harass an unwilling listener, especially one on her way to receive medical services." *Id*. at 781 (Stevens, J., concurring and dissenting). Similarly, Snyder has the right to present his messages, but he does not have the right to harass the Church's membership.

For the foregoing reasons, I respectfully dissent as I conclude that the trial court's findings are sufficient to justify the physical distance limitation.