Richard ROSEN, Plaintiff,

v.

STATE OF NORTH CAROLINA,
Defendant.

No. C–C–72–148.

United States District Court,
W. D. North Carolina,
Charlotte Division.

July 12, 1972.

George S. Daly, Jr., Charlotte, N. C., for plaintiff.

Charles A. Lloyd, Associate Atty., State of North Carolina, Dept. of Justice, Raleigh, N. C., for defendant.

## TEMPORARY RESTRAINING ORDER

McMILLAN, District Judge.

Monday, July 10, 1972, was the start of a week of criminal court in Mecklenburg County, North Carolina, and was also the start of the criminal trial of Charles Parker, T. J. Reddy, James Earl Grant and Clarence Harrison for allegedly burning a barn several years ago.

Richard Rosen, plaintiff, alleges that about nine o'clock on Monday, July 10 (an hour or so before court opened) he and fifteen or twenty other persons commenced peaceful picketing and leafleting in front of the Mecklenburg County Courthouse, Charlotte, North Carolina,

"between the courtyard obelisk and East Trade Street. Plaintiff and his compatriots carried placards reading such as 'Free T. J.,' 'Free Jim,' 'Free all Political Prisoners,' and 'Railroading is Alive in our Fascist Court.' Plaintiff and his compatriots also passed out leaflets regarding Angela Davis and Jim Grant. All of these actions were taken in prospect of the trial of Charles Parker, T. J. Reddy, James Earl Grant and Clarence Harrison, scheduled to commence at 10:00 A.M., July 10, 1972, in the said Mecklenburg County Courthouse. None of the actions of plaintiff or his compatriots were interlaced with verging violence or brigaded with action, but were entirely peaceful. At about 9:45 A.M., all such picketing and leafleting ceased, and the group repaired to the courtroom to witness the said trials."

Shortly after ten o'clock the same day, Judge Frank W. Snepp, judge presiding over the Criminal Term, without notice to the plaintiff or any of his associates, and without a hearing, entered an ex parte order reading as follows:

"It having come to the attention of the Court that certain persons are picketing the Mecklenburg County Courthouse and are walking in front of the main entrance to the courthouse carrying placards bearing captions such as 'Free the Political Prisoners' and 'Free T. J.', and are carrying and passing out leaflets describing one of the defendants in the above cases as a 'Political Prisoner';

"And it further appearing to the Court that jurors and witnesses engaged in the above trials enter the courthouse by this and other entrances, and that the conduct of these persons will tend to influence or intimidate the said jurors and witnesses,

"NOW, THEREFORE, IT IS HEREBY ORDERED:

"(1) No picketing, parading or congregation of persons, or the passing out of handbills shall be permitted during the trial of these cases along either side of East Trade Street between South McDowell Street and South Alexander Street; along either side of South Alexander Street between East Trade Street and East Fourth Street; along either side of East Fourth Street between South Alexander Street and South McDowell Street, or on any part of the courthouse grounds, lawns, walkways or in the courthouse building.

"(2) The Sheriff of Mecklenburg County is hereby ORDERED AND DIRECTED to read a copy of this Order to those persons who are assembled or may assemble in the above area for the purposes stated and to post a copy of this Order in conspicuous places about the area described above.

"(3) Persons disobeying this Order shall be subject to being taken into custody and be subjected to proceedings as for contempt of Court."

Plaintiff was immediately served with a copy of the order and filed the suit on the same afternoon, seeking a declaration that the quoted order is unconstitutional and seeking a temporary order restraining its enforcement.

After due notice, hearing was conducted at nine o'clock on July 11, 1972, at which time plaintiff was represented by his counsel, Mr. George S. Daly, Jr., and the defendant, the State of North

Carolina, was represented by Mr. Charles A. Lloyd, Staff Attorney from the office of the Attorney General of North Carolina.

[The court takes judicial notice of the facts that the westernmost of the two adjacent city blocks described in the order of the Superior Court embraces the Courthouse and the ten-story Law Building, occupied almost exclusively by lawyers; that the easternmost of the two blocks is occupied by the City-County Law Enforcement Building and the Attorneys Building, also a large office building for lawyers; and that the local jail occupies portions of both of the two blocks in question; the main courtrooms air-conditioned rooms on the second for criminal jury trials are windowless, floor of the Courthouse, a massive, columned building of classic beauty which was constructed in the late 1920's. The area described by plaintiffs where they did their alleged picketing is 100 to 150 feet or so north of the front doors of the building.]

■ A court sitting for the trial of cases has certain inherent powers, including powers to regulate the order of proceedings in the courtroom and to regulate activities in areas nearby which impede or threaten the processes of justice, and to prevent or punish for acts which directly interfere with the independence of judicial deliberations and the integrity of judicial decisions. The conduct and atmosphere of a trial must, of necessity, be calm and deliberative, and the proceedings must be as free as practicable from untoward interference. This is not to say that fairness can be guaranteed by a *cordon sanitaire* around judge, jury and witnesses during the actual trial; influences before the trial opens and anticipated reaction following a trial are bound to play a part in the thinking of jurors. It is an illusion to pretend that a few hours or days of isolation of court and jury from the outer world can guarantee fair trial; of more importance is the serious effort by court and jury to concentrate on the facts and issues before them in spite of outside influences, but to recognize such outside influences frankly and openly and to determine not to be affected by them. Nevertheless, protection of the judicial process does occasionally require some restraint upon participants and bystanders; and the ramifications of the power to punish for contempt and the power to make orders for the protection of court proceedings are extensive. See, for example, In Re Hennis, 276 N.C. 571, 173 S.E.2d 785 (1970); Blue Jeans Corporation v. Amalgamated Clothing Workers, 275 N.C. 503, 169 S.E.2d 867 (1969); McLucas v. Palmer, 309 F.Supp. 1353 (D.Conn.1970), affirmed, 427 F.2d 239 (2nd Cir. 1970), cert. denied, 399 U.S. 937, 90 S.Ct. 2271, 26 L.Ed.2d 808 (1970); 2 Strong's North Carolina Index 2d, "Contempt of Court," pp. 277, et seq.; 17 Am.Jur.2d, "Contempt," pp. 1, et seq.

■ The state has a legitimate interest in the fairness of judicial proceedings and is entitled to protect them by constitutional means.

■ A factual issue in all actions taken by courts to protect their processes is whether the conduct in question is in the "presence" of the court, or is a direct improper approach to a witness or juror, or constitutes what amounts to a "clear and present danger" to the integrity of the proceedings—an imminent rather than merely a likely threat to the administration of justice. Craig v. Harney, 331 U.S. 367, 67 S.Ct. 1249, 91 L.Ed. 1546 (1947); Wood v. Georgia, 370 U.S. 375, 82 S.Ct. 1364, 8 L.Ed.2d 569 (1962); Galyon v. Stutts, 241 N.C. 120, 84 S.E.2d 822 (1954).

■ Under the decisions just cited, freedom of speech and freedom of the press are accorded special protection against impairment through contempt procedures.

It needs also to be borne in mind that the emotional feelings of judges (the same may well be said of jurors) do not justify heavy-handed measures.

"Therefore, 'The vehemence of the language used is not alone the mea-

sure of the power to punish for contempt. The fires which it kindles must constitute *an imminent, not merely a likely, threat to the administration of justice.* The danger must not be remote or even probable; it must immediately imperil . . . [T]he law of contempt is not made for the protection of judges who may be sensitive to the winds of public opinion. Judges are supposed to be men of fortitude, able to thrive in a hardy climate.' Craig v. Harney, 331 U.S. 367, 376, [67 S.Ct. 1249, 1255, 91 L.Ed. 1546] (1947). 'Trial courts . . . must be on guard against confusing offenses to their sensibilities with obstruction to the administration of justice.' Brown v. United States, 356 U.S. 148, 153, [78 S.Ct. 622, 626, 2 L.Ed.2d 589] (1958)." In re Little, 404 U.S. 553, 92 S.Ct. 659, 30 L.Ed.2d 708 (1972). (Emphasis added.)

Factual questions, of course, exist in this case, whether the picketers with their particular placards and handbills exercising claims of free speech in fact constituted a clear and present danger to the fairness and integrity of the forthcoming judicial proceedings. Legal questions exist whether one with these handbills or placards is or is not entitled to the same freedom of speech that a newspaper publisher might have claimed under the cases above-cited. The "fair trial-free *press*" issue is, also, recognizable as a "fair trial-free *speech*" issue; and the decision of a particular case must, of necessity, involve the collection of evidence and the determination of facts and a balancing of the interest of the state and individuals in fair trial against the interest of the state and individuals in free speech under the First Amendment.

The substantive propriety of the order of the Superior Court is not necessarily involved in the proceedings before this court. Although the state court did not find plaintiff's conduct to be an imminent or a clear and present danger to the fairness of the forthcoming trial, it is possible to imagine the development of facts which might justify substantially all of the order that was entered or which might justify lesser portions of it. Such decisions need to be considered by the state judge who, after a proper hearing, makes the protective order for his own court. What ultimate narrower order might follow from such examination can not now be predicted.

■ However, it is not necessary to pass on the substance of the order because it is constitutionally defective in that it establishes, *ex parte*, a prior restraint upon the exercise of First Amendment rights of free speech, without notice nor hearing nor apparent effort to notify the respondents nor to conduct a hearing nor to give them an opportunity to be heard before the restraint was entered. Carroll v. President and Com'rs of Princess Anne, 393 U.S. 175, 89 S.Ct. 347, 21 L.Ed.2d 325 (1968).

In Carroll the trial judge of the state Circuit Court for the Eastern Shore of Maryland entered an *ex parte* order without notice, restraining Carroll and others from holding a Ku Klux rally with public address aid at the court house in Princess Anne, Maryland. The Supreme Court of the United States unanimously held the restraint to be invalid. The Court's language is eloquent:

"We need not decide the thorny problem of whether, on the facts of this case, an injunction against the announced rally could be justified. *The 10-day order here must be set aside because of a basic infirmity in the procedure by which it was obtained. It was issued* ex parte, *without notice to petitioners and without any effort, however informal, to invite or permit their participation in the proceedings.* There is a place in our jurisprudence for *ex parte* issuance, without notice, of temporary restraining orders of short duration; but there is no place within the area of basic freedoms guaranteed by the First Amendment for such orders

where no showing is made that it is impossible to serve or to notify the opposing parties and to give them an opportunity to participate.

"We do not here challenge the principle that there are special, limited circumstances in which speech is so interlaced with burgeoning violence that it is not protected by the broad guarantee of the First Amendment. In Cantwell v. [State of] Connecticut, 310 U.S. 296, at 308, [60 S.Ct. 900, at 905, 84 L.Ed. 1213] (1940), this Court said that '[n]o one would have the hardihood to suggest that the principle of freedom of speech sanctions incitement to riot.' See also Chaplinsky v. [State of] New Hampshire, 315 U. S. 568, 572, [62 S.Ct. 766, 769, 86 L. Ed. 1031] (1942); Milk Wagon Drivers Union [of Chicago, Local 753] v. Meadowmoor Dairies, 312 U.S. 287, 294, [61 S.Ct. 552, 572, 85 L.Ed. 836] (1941). Ordinarily, the State's constitutionally permissible interests are adequately served by criminal penalties imposed after freedom to speak has been so grossly abused that its immunity is breached. The impact and consequences of subsequent punishment for such abuse are materially different from those of prior restraint. Prior restraint upon speech suppresses the precise freedom which the First Amendment sought to protect against abridgment.

"The Court has emphasized that '[a] system of prior restraints of expression comes to this Court bearing a heavy presumption against its constitutional validity.' Bantam Books [, Inc.] v. Sullivan, 372 U.S. 58, 70, [83 S.Ct. 631, 639, 9 L.Ed.2d 584] (1963); Freedman v. [State of] Maryland, 380 U.S. 51, 57, [85 S.Ct. 734, 738, 13 L. Ed.2d 649] (1965). And even where this presumption might otherwise be overcome, the Court has insisted upon careful procedural provisions, designed to assure the fullest presentation and consideration of the matter which the circumstances permit. As the Court said in Freedman v. [State

of] Maryland, supra, at 58, [85 S.Ct., at 739,] a noncriminal process of prior restraints upon expression 'avoids constitutional infirmity only if it takes place under procedural safeguards designed to obviate the dangers of a censorship system.'

"Measured against these standards, it is clear that the 10-day restraining order in the present case, issued *ex parte,* without formal or informal notice to the petitioners or any effort to advise them of the proceeding, cannot be sustained. . . .

\*      \*      \*      \*      \*      \*

"In the present case, the record discloses no reason why petitioners were not notified of the application for injunction. They were apparently present in Princess Anne. They had held a rally there on the night preceding the application for and issuance of the injunction. They were scheduled to have another rally on the very evening of the day when the injunction was issued. And some of them were actually served with the writ of injunction at 6:10 that evening. In these circumstances, there is no justification for the *ex parte* character of the proceedings in the sensitive area of First Amendment rights.

"The value of a judicial proceeding, as against self-help by the police, is substantially diluted where the process is *ex parte,* because *the Court does not have available the fundamental instrument for judicial judgment: an adversary proceeding in which both parties may participate.* The facts in any case involving a public demonstration are difficult to ascertain and even more difficult to evaluate. Judgment as to whether the facts justify the use of the drastic power of injunction necessarily turns on subtle and controversial considerations and upon a delicate assessment of the particular situation in light of legal standards which are ·inescapably imprecise. In the absence of evidence and argument offered by both sides and of their participation in the formulation of value

judgments, there is insufficient assurance of the balanced analysis and careful conclusions which are essential in the area of First Amendment adjudication.

"The same is true of the fashioning of the order. *An order issued in the area of First Amendment rights must be couched in the narrowest terms that will accomplish the pin-pointed objective permitted by constitutional mandate and the essential needs of the public order. In this sensitive field, the State may not employ 'means that broadly stifle fundamental personal liberties when the end can be more narrowly achieved.'* Shelton v. Tucker, 364 U.S. 479, 488, [81 S.Ct. 247, 252, 5 L.Ed.2d 231] (1960). In other words, the order must be tailored as precisely as possible to the exact needs of the case. The participation of both sides is necessary for this purpose. Certainly, the failure to invite participation of the party seeking to exercise First Amendment rights reduces the possibility of a narrowly drawn order, and substantially imperils the protection which the Amendment seeks to assure." Carroll v. President and Com'rs of Princess Anne, *supra,* 180–184, 89 S.Ct. 351–353. (Emphasis added.)

In view of the above considerations, the quoted July 10, 1972, order of the Superior Court is invalid, and the defendant and all its officers, servants, agent and employees, both elected and otherwise chosen, are restrained pending further order of court from enforcing or carrying out that order in any manner.

Informally, during the twenty-four hours this matter has been under consideration by this court, word has been received of a new order issued by the Superior Court on July 11, 1972, which is narrower in its scope and which does allow certain picketing on the north (Trade Street) side of the courthouse grounds. The court is advised that the plaintiff and his cohorts are willing to abide by the new order; in substance it allows them to do what they were doing

when the controversy arose. However, issuance of the new order does not render the constitutional issue moot; it tends on the contrary to emphasize the continuing live nature of the controversy because the new order is subject to essentially the same constitutional infirmities as the original order of July 10th, and displays the same disregard of the constitutional requirement of notice and hearing before levy of a prior restraint upon free speech. In addition, the new order has a continuing adverse effect upon freedom of plaintiff and others to exercise their rights of free speech and assembly under the First Amendment. See Carroll v. President and Com'rs of Princess Anne, 393 U.S. at 178, 179, 89 S.Ct. 347. However, as a practical matter it may be that the legal proceedings need be pursued no further, since the duration of the trial will be brief; and counsel for the plaintiff, unless good cause to the contrary is shown, is requested to submit within thirty days a proposed judgment of dismissal.