**Phyllis LYNCH et al., Plaintiffs,**

v.

**Frank W. SNEPP et al., Defendants.**

**No. C–C–72–252.**

United States District Court,
W. D. North Carolina,
Charlotte Division.

Nov. 15, 1972.

On Motion for Stay Nov. 20, 1972.

George S. Daly, Jr., Charlotte, N. C., for plaintiffs.

Charles A. Lloyd, Asst. Atty. Gen., N. C. Dept. of Justice, Raleigh, N. C., for defendants.

## MEMORANDUM OF DECISION AND PRELIMINARY INJUNCTION

McMILLAN, District Judge.

### THE FACTS

On October 27, 1972, the defendant Judge Frank W. Snepp, resident North Carolina Superior Court Judge, *ex parte* and without notice, and based solely upon a one and one-fourth-page petition signed by the district prosecuting attorney, entered an injunction against "John Doe, Richard Roe and all others of like situation." It forbade disorders and various crimes and misdemeanors on or near any of the public school properties of Mecklenburg County, and it forbade the John Doe defendants, pending further orders of court:

"From going in the buildings or on the grounds of any public school or any administrative offices of the public schools or any property of the Charlotte-Mecklenburg Board of Education within the Charlotte-Mecklenburg School District, or on any street adjacent thereto and from going in the vicinity thereof with the following exceptions to this numbered paragraph:

(a) Students at the said schools who are attending classes or other regularly scheduled activities;

(b) Teachers, principals, staff and employees of the schools while in attendance to their regular and lawful duties;

(c) Those having permission from the school authorities and having business with the public schools;

(d) Law enforcement officers and public officials while in attendance to their regular and lawful duties;

(e) Parents or guardians of students attending the school while transporting those students to and from those schools."

The order notified the "defendants" to appear on October 30, 1972, and show cause, if any, why the order should not be continued in effect until final determination of the action.

No action was pending when the injunction was issued; no summons had been issued to anyone and none had been issued when this matter was heard by this court on November 3, 1972.

There is no evidence that school authorities sought, encouraged or advised the injunction.

Phyllis Lynch, Kelly M. Alexander, Jr., Robert Steele and Fledora Grier, plaintiffs in this case, appeared before Judge Snepp on October 30, 1972, and became parties and sought to obtain a

reversal of the October 27 order. They were successful in some particulars. The seventy-three elementary schools in the county were eliminated, leaving ten high schools and about twenty junior high schools scattered over a twelve-mile radius still subject to the order. In certain further though minor particulars the order was changed. The prohibition against being in the streets adjacent to the schools was eliminated. However, the prohibition against being on school property without "permission" was kept in effect and the persons authorized to give permission were limited to "administrative officers of the Charlotte-Mecklenburg Board of Education or [from] school principals."

Plaintiffs on October 31, 1972, the day the amended order was filed, brought this action seeking injunctive relief against enforcement of the order and a declaration of its unconstitutionality as an illegal prior restraint upon freedom of speech and freedom of assembly under the First Amendment to the United States Constitution and as violating the due process and equal protection clauses of the Fourteenth Amendment. Bad faith in the solicitor's petition and in the injunction and the order was alleged. A hearing after due notice was conducted on November 3, 1972. None of the defendants appeared, but they were represented by Mr. Charles A. Lloyd, Assistant Attorney General of North Carolina.

All the schools involved are in the Charlotte-Mecklenburg school system, whose operations have been and are the subject of continuing litigation in this court. (See Swann v. Charlotte-Mecklenburg Board of Education, Civil Action No. 1974. See also Givens v. Poe et al., D.C., 346 F.Supp. 202, in which the subject of discipline within the schools has been the subject of extended litigation and in which an order was entered on November 1, 1972, approving a new set of rules providing due process for students involved in disciplinary proceedings.)

## FACTS BEARING ON STANDING— THE RIGHT OF THESE PARTICULAR PLAINTIFFS TO CHALLENGE THE INJUNCTION

The only oral testimony at the hearing in this court was the testimony of Kelly Alexander, Jr., age 24, and Robert Steele, two of the plaintiffs. Alexander and Steele are black citizens who are interested in organizing and coordinating activities of the NAACP, both having official positions as coordinators of youth affairs. These coordinators have arrangements with student monitors in the schools who provide information on instances of violation of due process, racial discrimination and other student rights violations. Because of reports that black students were being discriminated against in the realm of suspensions from bus privileges and other school activities, Alexander and Steele started a "dialogue" with some of the principals. As illustration of this dialogue Alexander on October 13, 1972, wrote a letter to the principal of East High School. In that letter Alexander sought a conference with the principal to discuss among other things the school's alleged action in denying a student the opportunity to distribute literature at school and in refusing to allow a black students' club to be formed without advance accumulation of over two hundred signatures and approval by the student congress.

The principal had a conference with Alexander and Steele on October 26, 1972, at 4:00 P.M. It produced no change in the official attitude. It produced, plaintiffs say, comments comparing the plaintiffs' activities with those of the Ku Klux Klan. Plaintiffs say they were advised that none of their literature could be distributed except through a student club; that literature for the purpose of organizing the club could not be distributed because it was not being distributed by a club; and that NAACP literature could not be distributed unless ordered by the school superintendent or by a court. The principal had, however, allowed a student to

circulate an organization petition, and more than the required two hundred signatures had been accumulated.

The meeting ended in an apparent stalemate; no agreement was reached.

The principal reportedly indicated that there had been some disorder at the school that day (October 26), but "no major disruption"; and there was no disorder while Steele and Alexander were at the school.

Plaintiffs say that they have not visited many schools, but that they would like to be free to talk with students at lunch periods and before and after school and at other free times. They indicated that they desire to inform students about the new due process rules of discipline and about student rights on other matters.

Following the October 31, 1972, injunction, Robert Steele wrote to the high school monitors a memorandum summarizing the efforts that had been made in September and October and the problems that had been encountered, specifically, denial of permission to circulate literature at East, South and West High Schools, expulsion of students from school busses for long periods without hearing and with detrimental effect upon ability to do school work, and the other matters mentioned above. The memorandum warned the monitors against any demonstrations or violence, warned them to comply with the injunction, and advised that student complaints be channelled through parents while the injunction was in effect.

Because of the injunction plaintiffs have been forced to discontinue their work with the schools and the administrative staff. They have not sought permission under the order to visit the schools, but, apprehensive that any visit might be made the occasion for misunderstanding and possible punitive action, have stayed away. They appeared and contested the order at their earliest opportunity—on October 30, 1972.

This evidence concerning the persons who filed this particular suit is of relevance primarily on the question of "standing"—whether these plaintiffs stand to gain or lose because of the injunction and therefore whether they have the right to bring the suit.

## JURISDICTION

Article VI of the United States Constitution provides that

"This Constitution, and the Laws of the United States which shall be made in pursuance thereof; and all Treaties made, or which shall be made, under the Authority of the United States, shall be the supreme Law of the Land; *and the judges in every State shall be bound thereby, any Thing in the constitution or Laws of any State to the Contrary notwithstanding.*" (Emphasis added.)

The First Amendment to the United States Constitution, the "supreme law of the land," provides that

"Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or the press; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances."

The Fourteenth Amendment provides, in pertinent part:

". . . nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws."

The Civil Rights Act of 1871 (42 U.S.C. § 1983) provides:

"Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equi-

ty, or other proper proceeding for redress."

■ State judges are not immune from injunction, under the Civil Rights Act of 1871, against improper use of judicial authority in violation of the civil rights of citizens. Littleton v. Berbling, 468 F.2d 389 (7th Cir., 1972); Mitchum v. Foster, 407 U.S. 225, 92 S.Ct. 2151, 32 L.Ed.2d 705 (1972).

■■ Court orders [Austin v. Keefe, 402 U.S. 415, 91 S.Ct. 1575, 29 L.Ed.2d 1 (1971)], as well as legislation [Cox v. Louisiana, 379 U.S. 536, 85 S.Ct. 453, 13 L.Ed.2d 471, (1964)], must conform to the requirements of the Bill of Rights; judges, like lawmakers, must respect the United States Constitution.

Title 28 U.S.C. § 2283 provides that: "A court of the United States may not grant an injunction to stay proceedings in a State court *except as expressly authorized by Act of Congress*, or where necessary in aid of its jurisdiction, or to protect or effectuate its judgments." (Emphasis added.)

Section 2283 does not bar the suit; in Mitchum v. Foster, 407 U.S. 225, 92 S. Ct. 2151, 32 L.Ed.2d 705 (1972) the Supreme Court held that suits under Section 1983, the Civil Rights Act, are "expressly authorized by Act of Congress" within the exception in Section 2283.

Defendants say that plaintiffs lack standing; that there is no "case or controversy" before the court; that plaintiffs have not exhausted administrative remedies; that the court should abstain from decision pending appeal; that plaintiffs are unlikely to win on the merits; and that plaintiffs have not shown irreparable harm.

■ The sworn allegations and the evidence show harm that is great, irreparable and immediate. There is no likelihood that one-at-a-time damage suits after plaintiffs have run the risks and expense of criminal prosecution would be likely to protect the rights of speech and assembly which are indefinitely suspended by the order. One whose First Amendment right of free speech is suppressed should not be relegated to the role of a criminal defendant in order to get a ruling on the validity of that suppression. Bad faith is alleged. The history of declaratory judgment is such that without violating the injunction and undergoing a criminal prosecution it is doubtful that plaintiffs could get a North Carolina court to review the order on its merits. Plaintiffs have made a showing of substantial probability that they will prevail in a final hearing on the merits. Plaintiffs will not be required to exhaust administrative remedies by seeking permission to do what they have already been told they will not be allowed to do. Granting of "permission" after litigation arose is no proof that permission would have been granted before the suit was started—or that it will be granted, after. The plaintiffs, who have already been denied the rights sought by this suit, and who have intervened and resisted the issuance of the second order, do have standing to raise the constitutional issues. Walker v. Birmingham, 388 U.S. 307, 318, 87 S.Ct. 1824, 18 L. Ed.2d 1210 (1967). Plaintiffs have been inhibited and restrained by the order; they have no remedy at law; and they are entitled to present these issues for decision.

■ "Our federalism" (Younger v. Harris, 401 U.S. 37, 91 S.Ct. 746, 27 L. Ed.2d 699 (1971)) provides a dual system of state and federal servants. Comity, a judicial doctrine, contemplates that federal and state courts respect each other's opinions and problems. This minimizes conflicts. It is everyday courtesy. The United States Constitution, the supreme law of the land, values human freedom more than judicial courtesy, and requires that *all* state and federal judges respect the Bill of Rights, including rights of free speech and expression. Abstention, comity, and federalism are not valid reasons, on this record, for shirking this court's duty to investigate and protect against the alleged serious threats to constitutional freedom. The case should be decided on its merits.

## DUE PROCESS

■ The original injunction created, *ex parte* and *without notice*, a special local crime of unauthorized presence on Mecklenburg County school property, with summary punishment, without a jury, by way of contempt, as the penalty. Under North Carolina statutes and procedure, an injunction is not a cause of action or a lawsuit in and of itself, but is a remedy which is ancillary to a pending suit. Since no complaint or summons had been filed, no action had been instituted and there was no pending action to which the injunction could be ancillary. See North Carolina General Statutes § 1–485 and Rule 3, North Carolina Rules of Civil Procedure. In Freight Carriers v. Teamsters, 11 N.C. App. 159, 180 S.E.2d 461 [N.C.Ct. of Appeals 1971; cert. den. 278 N.C. 701, 181 S.E.2d 601 (1971)], the North Carolina Court of Appeals held void an injunction based on an affidavit, without prior filing of complaint or issuance of a summons; and contempt citations based on the injunction were set aside. The irregularity in the procedure is not excused by N.C.G.S. § 14–288.18, which expressly deals with procedures for getting injunctions during school emergencies. That statute does not appear to justify what was done here, because the persons authorized to bring suit under that statute are school officials, *not* the criminal prosecutor. The original order, so far as the record shows, was based purely upon the brief petition of the district solicitor, alleging in substance that persons unknown by name to him, students and non-students, had engaged in fighting and other disorderly conduct at East High School on October 26 and October 27, and that he was informed and believed that disorder was imminent at other high schools. It appears most doubtful that the supporting petition or the original order itself recites enough fact to support the injunction, even if the proper procedures for this extraordinary remedy had been followed.

■ Since no notice was given anyone of the original (October 27, 1972) injunction, it was void under well known due process principles. Carroll v. Princess Anne, 393 U.S. 175, 89 S.Ct. 347, 21 L.Ed.2d 325 (1968) (injunction against Ku Klux rally held invalid for lack of notice and opportunity to be heard before its issuance); Rosen v. North Carolina, 345 F.Supp. 1364 (W.D.N.C., 1972).

The second order was issued at 9:00 A.M. on October 31, 1972, following a hearing on October 30, 1972. At the October 30 hearing, pursuant to the notice, the burden was upon petitioners to show cause why the original injunction should not be continued in effect.

The findings of fact preceding the October 31, 1972 order are in somewhat greater detail than the conclusions in the first order, though they still relate mainly to the same incidents at East High School on October 26 and 27, 1972, and they are supplemented by rumors that persons unknown had weapons in automobiles; that disturbances at other schools had been reported; that "at least one participant" in the disturbance at East High School was not a student enrolled there; that such disturbances tend to spread from school to school and that disturbances in Mecklenburg (and in Buncombe County, a hundred and twenty miles west) have been reported through press and broadcasting media. There is a serious question whether as a matter of substance the findings support the order. The weakness of the findings and the lack of initial procedural safeguards are coupled with the placing of the burden on the defendants to show why their First Amendment rights should not continue to be suspended. It appears extremely doubtful that even the second injunction can stand as a matter of due process.

## FIRST AND FOURTEENTH AMENDMENT VIOLATIONS OF FREE SPEECH AND EQUAL PPROTECTION

■ Paragraph 2(c) of the amended order forbids plaintiffs and others to be present on the premises of ten senior

high schools and about twenty junior high schools without "permission from the administrative officers of the Charlotte-Mecklenburg Board of Education or from school principals."

This is a prior restraint upon the exercise of First Amendment rights.

The restraint is wide open, unqualified, and totally discretionary with the school principals and other administrative officials. No standard or purpose, public or otherwise, is laid down to guide the school authorities in granting or denying permission.

The authority to give permission for no reason is the authority to refuse permission for no reason—or for a reason which denies constitutional or other rights.

The authority to give or withhold "permission" is also the authority to discriminate among applicants and thereby to deprive applicants of equal protection of laws under the Fourteenth Amendment; the authority in charge could admit women and exclude men; he could admit blacks and exclude whites or vice versa; he could allow an organizer from the Drug Education Center or the American Legion, but not from the WCTU or the Veterans of Foreign Wars.

In Carroll v. Princess Anne, 393 U.S. 175, 89 S.Ct. 347, 21 L.Ed.2d 325 (1968), the Supreme Court, noting that elimination of prior restraints upon free speech was a "leading purpose" in the adoption of the First Amendment, said (at pages 180–181, 89 S.Ct. at page 351):

"There is a place in our jurisprudence for *ex parte* issuance, without notice, of temporary restraining orders *of short duration;* but there is no place within the area of basic freedoms guaranteed by the First Amendment for such orders where no showing is made that it is impossible to serve or to notify the opposing parties and to give them an opportunity to participate.

"We do not here challenge the principle that there are special, limited circumstances in which speech is so interlaced with burgeoning violence that it is not protected by the broad guarantee of the First Amendment. In Cantwell v. Connecticut, 310 U.S. 296, at 308 [60 S.Ct. 900, at 905, 84 L.Ed. 1213] (1940), this Court said that '[n]o one would have the hardihood to suggest that the principle of freedom of speech sanctions incitement to riot.' See also Chaplinsky v. New Hampshire, 315 U.S. 568, 572 [62 S.Ct. 766, 769, 86 L.Ed. 1031] (1942); Milk Wagon Drivers Union v. Meadowmoor Dairies, 312 U.S. 287, 294 [61 S.Ct. 552, 555, 85 L.Ed. 836] (1941). *Ordinarily, the State's constitutionally permissible interests are adequately served by criminal penalties imposed after freedom to speak has been so grossly abused that its immunity is breached.* The impact and consequences of subsequent punishment for such abuse are materially different from those of prior restraint. *Prior restraint upon speech suppresses the precise freedom which the First Amendment sought to protect against abridgment.*

"The Court has emphasized that '[a] *system of prior restraints of expression comes to this Court bearing a heavy presumption against its constitutional validity.*' Bantam Books v. Sullivan, 372 U.S. 58, 70 [83 S.Ct. 631, 639, 9 L.Ed.2d 584] (1964); Freedman v. Maryland, 380 U.S. 51, 57 [85 S.Ct. 734, 738, 13 L.Ed.2d 649] (1965). And even where this presumption might otherwise be overcome, the Court has insisted upon careful procedural provisions, designed to assure the fullest presentation and consideration of the matter which the circumstances permit. As the Court said in Freedman v. Maryland, *supra,* at 58 [85 S.Ct. at 739], a noncriminal process of prior restraints upon expression 'avoids constitutional infirmity only if it takes place under

procedural safeguards designed to obviate the dangers of a censorship system.' " (Emphasis added.)

██ The order, even in its amended form, flatly prohibits plaintiffs and others from visiting any of the ten high schools or the twenty junior high schools in Mecklenburg County without "permission" from school officials. Poll holders, we read, inquired whether the order prohibited them from going on school property to man the polls on November 7, election day. This is simply one illustration of the overbreadth and overreach of the order. It is indefinite as to time and remains in effect "pending further orders of this court." It covers more ground than any legitimate state interest could support; the described disorders at East High School and the rumors of disturbance at "other schools" and in Buncombe County would appear to be no basis for depriving plaintiffs and others, who were peaceable and who produced no disorder, from visiting the other twenty-nine schools peaceably in the exercise of constitutional rights of free expression. The order gives unrestricted discretion to school officials to give or deny permission. No standards of any kind are advanced or specified. It has simply been made a local crime, beyond the reach of jury trial, to visit a school except with the blessing of some school authority.

The General Assembly of North Carolina already has placed on the books one law (G.S. § 14–273) prohibiting wilful or intentional school disruptions or disturbances. The limiting concept of wilfulness or intention—the criminal intent so usually an element in criminal statutes—is totally missing from the order, which makes one subject to contempt even if the unpermitted visit is unintended!

The Supreme Court said in Shuttlesworth v. Birmingham, 394 U.S. 147, 150–151, 89 S.Ct. 935, 938, 22 L.Ed.2d 162 (1969),

[A]. . . . law subjecting the exercise of First Amendment freedoms to the prior restraint of a license, without *narrow, objective* and *definite standards* to guide the licensing authority, is unconstitutional." (Emphasis added.)

In Cox v. Louisiana, 379 U.S. 536, 557–558, 85 S.Ct. 453, 466, 13 L.Ed.2d 471 (1965) the Court said:

"This Court has recognized that the lodging of such broad discretion in a public official allows him to determine which expressions of view will be permitted and which will not. This thus sanctions a device for the suppression of the communication of ideas and permits the official to act as a censor. See Saia v. New York, *supra* [334 U.S. 558, at 562, 68 S.Ct. 1148, at 1150, 92 L.Ed. 1574 (1948)]. Also inherent in such a system allowing parades or meetings only with the *prior permission* of an official *is the obvious danger to the right of a person or group not to be denied equal protection of the laws.* See Niemotko v. Maryland, *supra* [340 U.S. 268, at 272, 284, 71 S.Ct. 325, at 327, 333, 95 L.Ed. 267, 280 (1951)]; *cf.* Yick Wo v. Hopkins, 118 U.S. 356 [6 S.Ct. 1064, 30 L.Ed. 220]. It is clearly unconstitutional to enable a public official to determine which expressions of view will be permitted and which will not or to engage in invidious discrimination among persons or groups either by use of a statute providing a system of broad discretionary licensing power or, as in this case, the equivalent of such a system by selective enforcement of an extremely broad prohibitory statute.

"It is, of course, undisputed that appropriate, limited discretion, under properly drawn statutes or ordinances, concerning the time, place, duration, or manner of use of the streets for public assemblies may be vested in administrative officials, provided that such limited discretion is 'exercised with "uniformity of method of treatment upon the facts of each application, free from improper or inappropriate considerations and from unfair

discrimination" . . . [and with] a "systematic, consistent and just order of treatment, with reference to the convenience of public use of the highways. . . ." ' Cox v. New Hampshire, *supra* [312 U.S. 569, 61 S.Ct. 762, 85 L.Ed. 1049 (1941)].

. . .

"But here it is clear that the practice in Baton Rouge allowing *unfettered discretion* in local officials in the regulation of the *use of the streets* for peaceful parades and meetings is an *unwarranted abridgment* of appellant's *freedom of speech and assembly* secured to him by the First Amendment, as applied to the States by the Fourteenth Amendment.. It follows, therefore, that appellant's conviction for violating the statute as so applied and enforced must be reversed." (Emphasis added.)

And in Austin v. Keefe, 402 U.S. 415, 419, 91 S.Ct. 1575, 1578, 29 L.Ed.2d 1 (1971), the Court reminds us that *"so long as the means are peaceful, the communication need not meet standards of acceptability."* (Emphasis added.)

## A WORD ABOUT THE AUTHORITY OF SCHOOL PRINCIPALS

 The order which follows does not reduce in any manner the lawful authority of school principals to maintain order and discipline; to require that education be the prime business of the students; to deal promptly under the new school discipline rules with students who require correction; and to call upon law enforcement authorities for aid in case of riot, disruption of school proceedings, criminal trespass and other violations of criminal law.

The principal is still in charge of his school.

 Campus visitors must remain peaceful and obey the laws.

Disorder and crisis can still be dealt with under the adequate criminal laws of North Carolina, without the threat to constitutional freedom created by the state court injunction.

## ORDER

The restriction on visiting school property imposed by the Superior Court injunctions of October 27 and October 31, 1972, on this showing, violate the constitutional rights of plaintiffs and others to free speech and assembly and petition, to due process of law, and to equal protection of laws. Pending final decision on the merits, defendants and all other officers, servants, agents and officials who do or may do their bidding and all who were authorized or consider themselves to be authorized by those orders are restrained from taking any further action of any kind to enforce paragraph three of the Superior Court order of October 27, 1972, and paragraph two of the Superior Court order of October 31, 1972.

## ON MOTION FOR STAY

 The defendants Snepp and Moore have filed a motion for a stay of the restraining order entered on November 15, 1972. A stay of this court's order would restore the prior restraint of the Superior Court order; and the normal processes of appeal require so many months that a stay of this court's order would, in practical effect, amount to a reversal of this court's order.

If during the litigation a court must decide between staying the hand of government or denying the First Amendment rights of individual citizens under the Constitution, the constitutional rights should receive first preference. The motion for a stay of the November 15, 1972, order is denied.