**Robert G. TILTON, an individual, Plaintiff,**

v.

**CAPITAL CITIES/ABC INC., a New York corporation; American Broadcasting Companies, Inc., a Delaware corporation; ABC News, Inc., a Delaware corporation; Diane Sawyer, an individual; Robbie Gordon, an individual; and Kelly Sutherland, an individual, Defendants.**

No. 92–C–1032–B.

United States District Court,
N.D. Oklahoma.

July 16, 1993.

Sheila Miller Bradley, Ted J. Nelson, J.C. Joyce, John C. Joyce, Joyce & Pollard, Tulsa, OK, for plaintiff.

Floyd Abrams, Susan Buckley, David G. Januszewski, Cahill, Gordon & Reindel, New York City, Harvey D. Ellis, Jr., Clyde A. Muchmore, Anton J. Rupert, Crowe & Dunlevy, Oklahoma City, OK, W. Kyle Tresch, Crowe & Dunlevy, Tulsa, OK, for defendants.

### FINDINGS OF FACT, CONCLUSIONS OF LAW AND ORDER

BRETT, District Judge.

This matter is before the Court on Plaintiff, Robert G. Tilton's motion for a preliminary injunction. The Court denied Plaintiff's application for temporary restraining order pursuant to Fed.R.Civ.P. 65 on May 14, 1993. Plaintiff seeks a preliminary injunction pending trial on the merits and after trial a permanent injunction to prevent Defendants from rebroadcasting or republishing only that false speech specifically set out in Plaintiff's third claim for relief involving alleged libelous and defamatory television programs broadcast on November 21, 1991 (*Prime-TIME I* ) and July 9, 1992 (*PrimeTIME II* ). The Court, having held an evidentiary hearing on June 2, 3, 7, 8 and 9, 1993, considered the evidence, the applicable legal authority and arguments of counsel, hereby makes the following Findings of Fact and Conclusions of Law regarding Plaintiff's motion for preliminary injunction.

### FINDINGS OF FACT

1. Plaintiff, Robert G. Tilton ("Tilton"), is an individual residing in Dallas County, Texas.

2. Defendants, Capital Cities/ABC Inc. ("Capital Cities"), American Broadcasting Companies, Inc. ("ABC"), and ABC News, Inc. ("ABC News"), are respectively New York, Delaware and Delaware corporations. Defendants, Diane Sawyer ("Sawyer"), Robbie Gordon ("Gordon"), and Kelly Sutherland ("Sutherland"), are individuals residing outside the State of Oklahoma and at the time complained of were employees of ABC acting within the scope of such employment.

3. Defendant, Diane Sawyer, is a correspondent for and the co-anchor of *PrimeTIME* and was the correspondent for the November 21, 1991 and July 9, 1992 broadcasts.

Defendant, Robbie Gordon, was the producer of the November 21, 1991 and July 9, 1992 broadcasts.

Defendant, Kelly Sutherland, was the associate producer for the November 21, 1991 and July 9, 1992 broadcasts.

4. At the time the actions complained of began, Plaintiff was the salaried president and principal pastor of Word of Faith World Outreach Center Church, Inc., a Texas not for profit corporation, which was dissolved on March 30, 1992 (Tr. 240: 1–6, Pl.Ex. 528–530). Plaintiff is now the principal pastor of Word of Faith World Outreach Center Church (Tr. 239: 20–21) (the "Church"), which has a local congregation of approximately 8,000 members in Farmers Branch, Dallas County, Texas, and also has international television Tilton ministry "partners."

5. Plaintiff's third claim for relief centers on the potential re-broadcast of certain *PrimeTIME Live* telecasts, which featured "an undercover investigation" of three television evangelists, W.V. Grant, Larry Lea, and the Plaintiff, Robert G. Tilton. The program at issue first aired on November 21, 1991 (*"PrimeTIME I"*). That same program was broadcast again with some minor changes to the first broadcast plus some additional "follow-up" material on July 9, 1992 (*"PrimeTIME II"*).

6. The Defendants were associated or involved with producing and/or broadcasting a weekly television program called *PrimeTIME Live* and specifically *PrimeTIME I* and *PrimeTIME II* (Affidavit of Kelly Sutherland, p. 1 ¶ 1 and footnote 1; Affidavit of Roberta Gordon, p. 3 in the seventh unnumbered paragraph).

7. Plaintiff alleges in his Complaint that the *PrimeTIME* broadcasts contained the following "three statements" which were libelous:

(1) Pastor Tilton claims the "holy water" he sends to viewers is from the River Jordan; Sawyer says it's from Taiwan;

(2) Pastor Tilton represents that he personally prays over prayer requests; Sawyer says most of the prayer requests mailed to Pastor Tilton are thrown in the trash by a bank before Pastor Tilton gets them;

(3) Pastor Tilton states in his church's magazine that he provides financial support to an orphanage in Haiti; Sawyer says he doesn't.

Such statements could implicate Plaintiff in a potential United States mail fraud scheme.

8. Plaintiff, Tilton, is a public figure for the purposes of this alleged libel action. (Stipulated by parties).

9. Marte Tilton, Pastor Tilton's spouse, is the business manager and head of the office administration of Tilton Ministries, including the Word of Faith Church. She is more knowledgeable concerning the day-to-day operations of the Tilton Ministries than he is.

10. Tilton asserts that as a result of Defendants' libelous broadcasts (*PrimeTIME I* and *PrimeTIME II*), he has experienced a chilling effect on his ability to have people accept him as a truthful christian minister. He further asserts the diminution of his television exposure has interfered with his inalienable basic human right to exercise his religious beliefs, "... because those persons who Plaintiff would have been able to reach but who were not reached can never be reached when they would have been reached." (Pl. Proposed Finding of Fact Nos. 49–50, filed June 28, 1993).

11. Regarding "holy water," pertinent parts of the broadcasts and the evidence revealed the following:

(a) On both *PrimeTIME I* and *PrimeTIME II*, Diane Sawyer, after referring to a "hidden camera" visit ABC News made to Response Media, Inc. and after disclosing to viewers that ABC obtained access to Response Media by telling its president, Jim Moore, "that we were media consultants for this man, Dallas minister Ole Anthony," stated:

"Tilton sends out an avalanche of things he asks viewers to send back to him—'miracle

prayer cloths' he promises to touch and place upon an alter, cords he says he'll place on a 'wall of deliverance,' arrows he'll use to take aim at a sufferer's needs, a tracing—place your hand there and he'll put his hand there, too. There's holy water from the River Jordan, 'miracle anointing oil'—though Moore said some of the items come from that holy place, Taiwan."

(Def.Ex. 30, pp. 15–16; Def.Ex. 31, p. 12).

(b) There is no dispute as to the accuracy of the first sentence of this passage.

(c) The second sentence stemmed from an exchange between Robbie Gordon and Jim Moore as they toured the offices of Response Media. (Gordon, p. 11).

(d) In the course of the tour provided by Moore to Gordon and Anthony, they passed wall displays of materials used by Tilton in his fund-raising efforts which included a display containing a button which Tilton had furnished to his followers. (Jim Moore, p. 189; Gordon, p. 11).

(e) Almost immediately after passing the Tilton wall displays, Gordon asked Moore: "Where do you get all this stuff from?" When Moore then responded by asking, "What do you mean?", Gordon stated, referring back to the Tilton display they had just passed, "Well, you know, like buttons. I just saw you have, like, water—." (Pl.Ex. 570, p. 33; Def.Ex. 21).

(f) In what Gordon understood to be an answer to her questions, Moore responded, "Oh, we've got—we've been doing this for so long that we've got it down to a science." When Gordon responded by asking if Response Media had "storehouses," Moore answered by saying, "Yeah, we get stuff from Taiwan." (Pl.Ex. 570, p. 33; Gordon, p. 11).

(g) Moore acknowledged, after watching the tape of his exchange in his offices with Gordon, that it was "possible" that Gordon understood his response about Taiwan to respond to Gordon's direct inquiry about where he got "all this stuff from." (Moore, p. 193).

(h) Gordon's affidavit states unequivocally that she understood Moore's answer about Taiwan to be a response to her question

about where he got "all this stuff from" including the Tilton button to which she had specifically referred. Accordingly, her affidavit concludes, "the broadcast … ironically observed that 'some of the items came from that holy place, Taiwan.'" (Gordon, p. 11).

(i) Defendant Robbie Gordon stated in the raw footage following their interview with Jim Moore that "I really wanted to get him to say that stuff is not from the River Jordan …" (Pl.Ex. 270, p. 66).

(j) Moore testified that he never purchased any items from Taiwan for Plaintiff.

(k) The evidence established that the "holy water" sent to "partners" was from the River Jordan in Israel.

(l) The broadcast did not say the holy water came from Taiwan. It said that some of the other items mailed to "partners" by Tilton came from that "holy place Taiwan." The "holy place Taiwan" reference was sardonic editorializing by Defendants. Gordon reasonably could have concluded from Moore's general reference to Taiwan that some of the items Tilton mailed out may have come from Taiwan, i.e., buttons, cloth, cords, etc.

(m) Jim Moore, in the hidden camera interview, made affirmative statements regarding the sincerity and honesty of Tilton and his ministry that ABC did not include in either *PrimeTIME I* or *II*.

12. Regarding prayer requests thrown in the trash, pertinent parts of the broadcasts and the evidence revealed the following:

(a) Towards the conclusion of both *PrimeTIME I* and *PrimeTIME II*, in generally similar language, Diane Sawyer stated the following:

"And those items that people have prayed over and sent in, believing Robert Tilton would touch them and pray over them too? Well, if some made it to Tilton, there are thousands that didn't. We found them in the garbage at the bank and the marketing research center. The 'angels of God,' the prayer cords, the arrows—this person wanted his aimed at getting a real dad—the tracing where Tilton said he'd place his

hand, ripped up by letter processors. We found heartbreaking appeals from followers and letters like this one. It came with personal photographs for Pastor Bob and a prayerful message. It also came with a $7,000 pledge. The money probably made it to Tilton. The prayers went in the trash."

(Def.Ex. 31, p. 15; Def.Exh. 30, p. 19).

(b) Tilton and the church had a well thought out and conceived ongoing computerized mail program to television "partners." Over the past approximately six years, in consultation with Internal Data Management ("IDM") and Response Media of Tulsa, Oklahoma, Tilton and the church have had numerous computerized mail projects in response to persons that have communicated their interest in Tilton from Tilton's television ministry. The projects essentially invited the prayer partner by mail to send Pastor Tilton on the form provided by return mail their immediate prayer concerns so he personally could pray over them. Each letter to the prayer partner may include a prayer cloth, a traced hand print of Pastor Tilton, holy water, a cardboard arrow or angel, prayer cord, ministry literature, etc., relating to various project themes and directed to strengthening the "partner's" christian faith and relationship with Tilton and his ministry. The partner is requested to consider making a financial vow or commitment to be returned with their written prayer request over which Pastor Tilton will personally pray.

(c) Various mailing projects would cause the Tilton television ministry to receive a volume of many thousands of "partner" mail responses or written prayer requests per month. (Def.Ex. 136). Approximately one in six or one in seven would contain a financial gift to Tilton Ministries of varying amounts of money, from small change up to thousands of dollars. The volume of mail during most months is so large that it would be impossible for Tilton to read and pray over each letter individually.

(d) The evidence established that although such partner mail is sent to Dallas, Texas, it is immediately forwarded on to the Commercial Bank and Trust Company of Tulsa, Oklahoma ("Commercial Bank and Trust"), un-

opened, where trained personnel open each envelope, make a written accounting of all money gifts, and maintain an accurate record of the partners' contributions. Bank personnel are instructed not to read letters or prayer requests to Tilton or the Tilton ministry. The next day all envelopes and contents, excluding the accounted for money contributions, are delivered to IDM in Tulsa, Oklahoma. Appropriately trained personnel, such as students from local christian theology schools or colleges, read each letter and through a computerized coding system prepare a response over the computerized signature of Pastor Tilton to be mailed to the "partner." The computerized response will address the specific prayer request concerns of the partner, i.e., financial, illness, drug addiction, alcohol, prison, marital discord, etc. In the event a partner expressed emergency prayer concern, such as suicide, there are special handling instructions for the ministry to communicate with the partner.

(e) After the IDM computerized response is processed and a permanent computer record is made of the partners' project correspondence, all prayer requests are sent daily to Pastor Tilton to pray over at the church designated prayer room or Tilton's prayer closet in Dallas, Texas. Pastor Tilton is the only one present as he prays over what are often sizeable mounds or stacks of partner personal written prayer requests and/or computerized lists of same.

(f) In the course of her research for the broadcast, the Defendant Gordon met and received the assistance of Ole Anthony, the president of a Dallas religious organization called the Trinity Foundation which has been critical of what Anthony refers to as big money TV preachers. (Gordon Affidavit dated 6–9–93, pp. 5–6; Anthony Affidavit dated 6–8–93, pp. 2–3).

In September 1991, after Gordon and Anthony toured Response Media, Inc. and learned of the existence of Commercial Bank and Trust, Anthony and two of his colleagues, Powell Holloway and Harry Guetzlaff, engaged in a number of "trash runs" during which they examined trash in containers outside Commercial Bank and Trust and IDM.

Anthony and his associates made numerous trash runs in September and October 1991, in which thousands of personal prayer request letters directed to Tilton were discovered in trash containers outside IDM and the bank and some at Tulsa Recycling Company which were transported to Dallas, Texas for ABC personnel to observe. The trash retained by Anthony and his associates also contained holy water, Jerusalem sand, prayer cloths and cords, angels, arrows, Tilton hand tracings, etc., in addition to partner written personal prayer requests. The postmark date on many of the prayer request envelopes was such that they could not have been sent from either the bank or IDM to Dallas, Texas to be prayed over by Tilton. Many of the prayer requests Anthony stated in his log, and confirmed by deposition, that he found in the trash on September 11, 1991, could not have been found then because the postmark date was after September 11, 1991. Anthony recanted by subsequent affidavit, stating that such prayer requests must have come from the October trash search because the trash searches were the sole and only source from which they came. Plaintiff asserts the fruits of the trash search were "planted" by ABC operatives, but as yet this is an unsupported accusation.

(g) Letters written to the Tilton Ministry by a viewer on their personal stationery is referred to as "white mail." The Tilton Ministry policy was such that white mail letters containing personal prayer requests were not always sent to Tilton to personally pray over. (Tr. 382).

(h) The first letter that Robert Tilton Ministries forwards to individuals who respond in writing or by telephone to Tilton's appearance on television is referred to by the ministry as P–21. (Def.Ex. 144). It is a "Prayer of Agreement" between Tilton and his new partner which covers 21 days during which Tilton agrees to pray in agreement with his new partner. Specifically, IDM forwards a red prayer cloth that Tilton's partners are asked to return to Tilton with their contributions and vows. IDM also forwards three documents on which the partners are asked to write their prayer requests to Tilton on days 1, 8 and 15 of a 21–day period. Self-addressed envelopes are enclosed for the prayer requests. They are addressed to Robert Tilton at a post office box address in Dallas. (*Id.*).

On the back of the document that says "Day 8" on it, it states "PRAYER OF AGREEMENT MIRACLE REQUESTS." It then states, "Bob, please continue to pray and agree with me about the following needs in my life." Eight blank lines are then provided for Tilton's partners to fill in their prayer requests. On the left of the form, it states, "Send this back to me on Day 8. Bob." Above the form is a place where partners state how much money is being contributed or vowed. This prayer request form is referred to by the ministry as P–21B. (*Id.*)

Pursuant to a policy decision of the Tilton ministry reflected in official instructions sent to IDM, IDM was told "to keep the entire number 2 [P–21B or day 8] and number 3 [P–21C or day 15] reply devices for their batch records. No part will be returned to Word of Faith. Pastor Tilton will pray by faith over these needs." (Def.Ex. 544). As a result, IDM did not forward any form P–21Bs and P–21Cs from Tulsa to Dallas and Reverend Tilton never personally received or prayed over them. (Conners, pp. 28–29; M. Tilton, p. 204). IDM would prepare a lengthy computer list of "Prayer of Agreement—second week or third week" prayer requests, not listing the specific prayer request of the partner, for Tilton to pray over. The Tiltons said this was done because it was intended the second and third week prayer requests (P–21B and P–21C) in the Prayer of Agreement "packet" were to be the same prayer as the first week already sent to and prayed over by Tilton.

The instruction information sent the partner in the "Prayer of Agreement" packet (P–21) did not state the first, second and third week partner prayer requests were to be the same request. The evidence indicated the partner second and third week prayer requests (P–21B and P–21C) were often new personal prayer requests, not the same as the first week. It was these second and third week partner personal prayer requests found in the trash by the thousands along

with some white mail that had not been sent to Tilton to personally receive and pray over. However, P–21B and P–21C would appear on the computerized listing by partner name with the notation "Prayer Agreement—second or third week" along with the Prayer of Agreement code. (Pl.Ex. 576–585; Tr. 776–778). White mail would also be on the computer listing sent Tilton to pray over, with an abbreviation of the prayer request.

Michael Conners, the president of IDM, and Bob and Marte Tilton found it "disturbing" when they learned for the first time that P–21B and P–21C personal prayer requests were not being sent to Pastor Tilton in Dallas. (Tr. p. 734). Concerning the Tilton Ministries manager's instructions to IDM to not send P–21B and P–21C personal prayer requests to Pastor Tilton, Conners testified, "I would say that based on my personal meetings with Bob and Marte and their understanding that all prayer requests were being sent, I would say yes, it was a mistake on the manager's part." (Tr. 739).

(i) The evidence thus far does not establish that ABC and its personnel knew or should have known that partner written prayer requests 21B or 21C, or white mail prayer requests, were not to be forwarded to Tilton personally to pray over. The partner "Prayer of Agreement" (P–21) instruction packet was at best ambiguous in this regard.

13. Regarding the subject of the Haitian orphanage and Tilton Ministries association or support of such an orphanage, the evidence revealed the following:

(a) On *PrimeTIME I* and *PrimeTIME II*, Diane Sawyer recalled an earlier part of the broadcast (concerning another televangelist) and ABC's interview of Bob Jones, "who told us for just a few thousand a month, we could put up a sign and claim an entire orphanage, even if we weren't the only contributor." Sawyer then stated on *PrimeTIME I:*

"Tilton uses three different names for his Haiti orphanages, so when we went to Haiti, we asked the government officials in charge of foreign missions if they heard of any of Tilton's orphanages. They said no. [interviewing] So nothing about Robert Tilton here?

HAITIAN OFFICIAL: No."

(Def.Ex. 30, p. 16). Sawyer stated on *PrimeTIME II:*

"So even though his magazine calls it the Robert Tilton Ministries Children's Home, it's really not Tilton's place at all, which is why government officials we spoke to in Haiti hadn't heard of Tilton or his orphanage.

[interviewing] So nothing from Robert Tilton here?

HAITIAN OFFICIAL: No."

(b) Tilton or Tilton Ministries referred to the Haitian orphanage as Children's Hope Center, Robert Tilton Ministries' Children's Home and World Harvest Orphanage. (Aff., Sutherland; Marte Tilton, Tr. 224–227). The Defendants Sutherland, Gordon and Sawyer made various trips to Haiti and were informed such orphanages were required by law to register with the Haiti Ministry of Foreign Affairs and Cults. (Aff. Sutherland). While in Haiti they talked to Haitian government ministry officials to locate the above named orphanages but there was no record of them. (Aff. Sutherland and Gordon). They also checked Haitian christian mission and orphanage lists and directories and found no such listing. (Aff. Sutherland and Gordon). Inquiries were also made of various christian mission and orphanage personnel in Haiti regarding locating the three named orphanages but without success. (Aff. Sutherland). As they drove around Port-au-Prince looking for the orphanage, a photograph of the orphanage taken from a Tilton Ministries publication was displayed to various persons but they were unable to locate the orphanage by any of the three names. (Aff. Sutherland).

Upon returning to the United States from Haiti, Sutherland obtained a copy of a letter from a Tilton Ministries' employee that said Tilton Ministries supported a children's orphanage in Haiti, sending funds through Reverend and Mrs. Lee Sullivan of Dallas, Texas, giving a post office box number where the Sullivans could be located. No telephone number for Lee Sullivan could be located in the Dallas directory and a letter sent to the post office box number had not been answered. (Aff. Sutherland). The Sullivans

are listed in the Dallas, Texas telephone directory under Mrs. Sullivan's name, Ethelyn Sullivan, although she commonly goes by the name "Chris." (Lee Sullivan, Tr. 449).

Lee Sullivan testified at trial that he was the founder and director of an orphanage in Port-au-Prince, Haiti that operates under the name of World Harvest Orphanage since 1982, which houses and feeds from 40 to 65 children. He testified Tilton Ministries is a major contributor and has provided about one-third to one-half of the orphanage support in the amount of $1,200.00 per month since 1986, plus occasional separate project gifts. (Sullivan, Tr. 420–421). The records of the Tilton Ministries confirmed this level of contribution. (Marte Tilton, Tr. 178–179). Reverend Sullivan stated that his orphanage is registered with the Haitian office of Permit de Jourres' (spelled phonetically), which permits it to own and sell real property in Haiti. (Sullivan, Tr. 418). Reverend Sullivan stated the orphanage is rather primitive, having no telephone, electricity, or city water service. (Sullivan, Tr. 419). He stated the orphanage could have been located through the U.S. Embassy with whom he personally registers on each of his many trips to Haiti. (Sullivan, Tr. p. 424–425). The World Harvest Orphanage has never registered with the appropriate Haitian ministry of government because of the instability of the Haitian government and to avoid government supervision or interference. (Sullivan, Tr. 426–428). Reverend Sullivan stated there are many orphanages located in Haiti and finding a particular one is like "trying to find a needle in a haystack." (Sullivan, Tr. 442).

(c) The record thus far indicates that the Defendants were making a reasonable effort to locate the Haitian orphanage with which the Tilton Ministries was associated and supported.

14. The subject television broadcasts (*PrimeTIME I* and *PrimeTIME II*) are critical of Plaintiff's television ministry and have clearly negatively impacted his reputation as a christian minister and diminished his past and future viewing audiences and "partners." However, Pastor Tilton is free to practice his own personal religion as he sees fit and there is no governmental interference therewith.

## CONCLUSIONS OF LAW AND ORDER

1. The Court has jurisdiction of the subject matter pursuant to 28 U.S.C. § 1332.

2. Any Finding of Fact above which could be properly characterized a Conclusion of Law is incorporated herein.

3. Because Reverend Tilton is a public figure, he has the burden as Plaintiff of proving his libel claim relative to falsity and actual malice by the heightened standard of clear and convincing evidence. *New York Times v. Sullivan*, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964); *Carr v. Brasher*, 776 S.W.2d 567 (Tex.1989); *Miskovsky v. Oklahoma Publishing Co.*, 654 P.2d 587 (Okla.), *cert. denied*, 459 U.S. 923, 103 S.Ct. 235, 74 L.Ed.2d 186 (1982).

4. In order to obtain a preliminary injunction under Fed.R.Civ.P. 65, the Plaintiff has the burden of proving the following:

(1) There is a substantial likelihood that Plaintiff will prevail on the merits;

(2) He will suffer irreparable injury unless the injunction issues;

(3) The threatened injury to Plaintiff outweighs whatever damage the proposed injunction may cause the opposing party; and

(4) The injunction, if issued, would be adverse to public interest and public policy.

*Resolution Trust Corp. v. Cruce*, 972 F.2d 1195, 1198 (10th Cir.1992), and *Lundgrin v. Claytor*, 619 F.2d 61, 63 (10th Cir.1980).

5. Plaintiff has not thus far demonstrated that there is a substantial likelihood of recovery on the merits regarding the three claimed libels (holy water from Taiwan, personal written prayer requests in the trash, and the orphanage in Haiti), because Plaintiff's evidence does not rise to the standard level required in paragraph 3 immediately above.

6. The fundamental law of libel in both Oklahoma and Texas is that monetary damages are an adequate and appropriate remedy and that injunctive relief is not available. *Schmoldt v. Oakley*, 390 P.2d 882, 886 (Okla.1964); *Hajek v. Bill Mowbray Motors, Inc.*, 647 S.W.2d 253, 255 (Tex.1983); *Corpus*

*Christi Caller–Times v. Mancias,* 794 S.W.2d 852 (Tex.Ct.App.1990); *Pirmantgen v. Feminelli,* 745 S.W.2d 576 (Tex.Ct.App.1988); *Dallas Oil & Gas, Inc. v. Mouer,* 533 S.W.2d 70, 74 (Tex.Civ.App.1976); *see also, In re Providence Journal Co.,* 820 F.2d 1342, 1345 (1st Cir.1986), *modified on rehearing en banc on other grounds,* 820 F.2d 1354 (1st Cir. 1987), *cert. dismissed,* 485 U.S. 693, 108 S.Ct. 1502, 99 L.Ed.2d 785 (1988); *Lemons v. Mycro Group Co.,* 667 F.Supp. 665, 667 (S.D.Iowa 1987); *Sunward Corp. v. Dun & Bradstreet, Inc.,* 568 F.Supp. 602, 609 (D.Colo.1983), *aff'd in part and rev'd in part on other grounds,* 811 F.2d 511 (10th Cir. 1987); *Konigsberg v. Time, Inc.,* 288 F.Supp. 989 (S.D.N.Y.1968).

■ Herein, the fact that the Plaintiff seeks to enjoin the rebroadcast of the alleged defamatory audio and video does not provide an exception to the rule that money damages are an adequate remedy at law. *See, Schmoldt v. Oakley,* 390 P.2d 882, 886 (Okla.1964); *Hajek v. Bill Mowbray Motors, Inc.,* 647 S.W.2d 253 (Tex.1983); *Pirmantgen v. Feminelli,* 745 S.W.2d 576 (Tex.Ct.App. 1988); *Dallas Oil & Gas, Inc. v. Mouer,* 533 S.W.2d 70 (Tex.Civ.App.1976); and *Lawrence v. Atwood,* 295 S.W.2d 298 (Tex.Civ.App. 1956).

■ The First Amendment to the United States Constitution provides protection against government action, not the action of private parties as herein. *Albright v. Longview Police Dep't.,* 884 F.2d 835, 841 (5th Cir.1989); *Belluso v. Turner Communications Corp.,* 633 F.2d 393, 398 (5th Cir.1980); *Kuczo v. Western Connecticut Broadcasting Co.,* 566 F.2d 384, 387 (2d Cir.1977); *Massachusetts Universalist Convention v. Hildreth & Rogers Co.,* 183 F.2d 497, 501 (1st Cir. 1950) (adopting the opinion of the District Court, 87 F.Supp. 822, 825 (D.Mass.1949)); *McIntire v. William Penn Broadcasting Co.,* 151 F.2d 597, 601 (3d Cir.1945), *cert. denied,* 327 U.S. 779, 66 S.Ct. 530, 90 L.Ed. 1007 (1946); *Moro v. Telemundo Incorporado,* 387 F.Supp. 920, 925 (D.P.R.1974); *Smothers v. Columbia Broadcasting Sys.,* 351 F.Supp. 622, 627 (C.D.Cal.1972); *Post v. Payton,* 323 F.Supp. 799, 803–04 (E.D.N.Y.1971).

7. The law interpreting the First Amendment of the Constitution generally affords publishers and broadcasters protection against prior restraint. *Nebraska Press Ass'n v. Stuart,* 427 U.S. 539, 559, 96 S.Ct. 2791, 2802–03, 49 L.Ed.2d 683 (1976); *see also, New York Times Co. v. United States,* 403 U.S. 713, 91 S.Ct. 2140, 29 L.Ed.2d 822 (1971); *Organization for a Better Austin v. Keefe,* 402 U.S. 415, 91 S.Ct. 1575, 29 L.Ed.2d 1 (1971); *Carroll v. President & Commissioners of Princess Anne,* 393 U.S. 175, 89 S.Ct. 347, 21 L.Ed.2d 325 (1968); *Near v. Minnesota,* 283 U.S. 697, 51 S.Ct. 625, 75 L.Ed. 1357 (1931); *In re Search of Kitty's East,* 905 F.2d 1367, 1371–72 (10th Cir.1990); *Davenport v. Garcia,* 834 S.W.2d 4, 9 (Tex.1992); *Star–Telegram, Inc. v. Walker,* 834 S.W.2d 54 (Tex.1992).

In order for prior restraint to be lawful, the circumstances must fit within one of the narrowly defined exceptions of *Freedman v. Maryland,* 380 U.S. 51, 58, 85 S.Ct. 734, 738–39, 13 L.Ed.2d 649 (1965), and *Southeastern Promotions Ltd. v. Conrad,* 420 U.S. 546, 559, 95 S.Ct. 1239, 1246–47, 43 L.Ed.2d 448 (1975). The evidence presented herein does not come within the prescribed exceptions.

For these reasons, balancing of the equities does not favor the Plaintiff herein.

8. Freedom of speech as protected by the First Amendment of the Constitution is a matter of public interest and/or policy. *Cantwell v. Connecticut,* 310 U.S. 296, 310, 60 S.Ct. 900, 906, 84 L.Ed. 1213 (1940); *Albright v. Board of Educ.,* 765 F.Supp. 682, 686–87 (D.Utah 1991); *see, Lemons v. Mycro Group Co.,* 667 F.Supp. 665, 668 (S.D.Iowa 1987).

■ 9. For the reasons expressed in these Findings of Fact and Conclusions of Law, Plaintiff's requested preliminary injunction pursuant to Fed.R.Civ.P. 65 is hereby DENIED.